# UNITED STATES *v.* LOUGHREY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 22. Argued and submitted April 21, 1898. — Decided December 12, 1898.

Under the act of June 3, 1856, c. 44, 11 Stat. 21, the State of Michigan took the fee of the lands thereby granted, to be thereafter identified, subject to a condition subsequent that, if the railroad, to aid in whose construction they were granted, should not be completed within ten years, the lands unsold should revert to the United States; but, until proceedings were taken by Congress to effect such reversion, the legal title to the lands and the ownership of the timber growing upon them remained in the State, and the United States could not maintain an action of trespass against a person unlawfully entering thereon, and cutting and removing timber from the land so granted: and timber so cut and separated from the soil was not the property of the United States, and did not become such after acquisition of the lands by reversion; and the United States could not avail themselves of the rule that in an action of trover, a mere trespasser cannot defeat the plaintiff's right to possession by showing a superior title in a third person, without showing himself in priority with, or connecting himself with such third person.

THIS was an action originally begun by the United States in the Circuit Court for the Eastern District of Wisconsin, to recover the value of timber cut from the north half of the northwest quarter of the northeast quarter of section thirteen, township forty-four north, of range thirty-five west, in the State of Michigan. The complaint charged the cutting of the timber by one Joseph E. Sauve, and that he removed from the lands 80,000 feet of timber so cut and left the balance

skidded upon the lands. The defendants were charged as purchasers from Sauve. The amount of timber cut by Sauve was alleged to have been 600,000 feet, and the time of the cutting in the winter of 1887–8 and prior to the first day of March, 1888.

The case was tried by the court without a jury upon facts stipulated as follows :

First. The defendants, prior to the first day of March, 1888, cut and removed from the north half ($\frac{1}{2}$) of the northwest quarter (NW. $\frac{1}{4}$), and the northwest quarter (NW. $\frac{1}{4}$) of the northeast quarter (NE. $\frac{1}{4}$), and the southeast quarter (SE. $\frac{1}{4}$) of the northeast quarter (NE. $\frac{1}{4}$) of section thirteen (13), in township forty-four (44) north, of range thirty-five (35) west, in the State of Michigan, four hundred thousand (400,000) feet of pine timber, and converted the same to their own use.

Second. That such cutting and taking of said timber by the defendants from said land was not a wilful trespass.

Third. That none of the lands in question were ever owned or held by any party as a homestead.

Fourth. That the value of said timber shall be fixed as follows : That the value of the same upon the land or stumpage, at $2.50 per thousand, board measure; that the value of the same when cut and upon the land, $3.00 per thousand, board measure ; that the value of the same when placed in the river was $5.00 per thousand, board measure; that the value of the same when manufactured was $7.00 per thousand, board measure.

Fifth. That the lands above described were a part of the grant of lands made to the State of Michigan by an act of the Congress of the United States, approved June 3, 1856, being chapter 44 of volume 11 of the United States Statutes at Large, and that said lands were accepted by the State of Michigan by an act of its legislature, approved February 14, 1857, being public act No. 126 of the laws of Michigan for that year, and were a part of the lands of said grant within the six-mile limit, so called, outside of the common limits, so called, certified and approved to said State by the Secretary of the Interior, to aid in the construction of the railroad men-

tioned in said act No. 126 of the laws of Michigan of 1857, to run from Ontonagon to the Wisconsin state line, therein denominated "The Ontonagon and State Line Railroad Company."

The finding of facts by the court was in accordance with the foregoing stipulation, with the additional finding that said railroad was never built and said grant of lands was never earned by the construction of any railroad.

And as conclusions of law, the court found:

First. That the cause of action sued on in this case did not, at the time of the commencement of this action, and does not now, belong to the United States of America.

Second. That the defendants are entitled to judgment herein for the dismissal of the complaint upon its merits.

No exceptions were taken to the findings of fact, and no further requests to find were made. Exceptions were only taken to the conclusions of law found by the court, and for its failure to find other and contrary conclusions.

Upon writ of error sued out from the Circuit Court of Appeals, the judgment of the Circuit Court dismissing this complaint was affirmed. 34 U. S. App. 575.

Whereupon the United States sued out a writ of error from this court.

*Mr. George Hines Gorman* for plaintiffs in error. *Mr. Solicitor General* was on his brief.

*Mr. W. H. Webster* for defendants in error submitted on his brief.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

To entitle the plaintiff to recover in this action, which is substantially in trover, it is necessary to show a general or special property in the timber cut, and a right to the possession of the same at the commencement of the suit.

There is no question that the lands belonged to the United

States prior to June 3, 1856. By an act of Congress, passed upon that date, 11 Stat. 21, c. 44, it was enacted that " there be, and hereby is, granted to the State of Michigan, to aid in the construction of railroads from Little Bay de Noquet to Marquette, and thence to Ontonagon, and from the two last named places to the Wisconsin state line," with others not necessary to be mentioned, " every alternate section of land designated by odd numbers; for six sections in width on each side of each of said roads; . . . which lands . . . shall be held by the State of Michigan for the use and purpose aforesaid: *Provided,* That the lands to be so located shall in no case be further than fifteen miles from the lines of said roads, and selected for, and on account of each of said roads : *Provided, further,* That the lands hereby granted shall be exclusively applied in the construction of that road for and on account of which said lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever." By the third section it was enacted that the " said lands hereby granted to the said State shall be subject to the disposal of the legislature thereof, for the purposes aforesaid, and no other." Provision was made in the fourth section for a sale of the lands for the benefit of the railroads as they were constructed. The last clause provided that "if any of said roads is not completed within ten years no further sales shall be made, and the lands unsold shall revert to the United States."

1. Under this act the State of Michigan took the fee of the lands to be thereafter identified, subject to a condition subsequent that if the roads were not completed within ten years the lands unsold should revert to the United States. With respect to this class of estates Professor Washburn says that " so long as the estate in fee remains, the owner in possession has all the rights in respect to it, which he would have if tenant in fee simple, unless it be so limited that there is properly a reversionary right in another — something more than a possibility of reverter belonging to a third person, when, perhaps, chancery might interpose to prevent waste of the prem-

ises." 1 Wash. Real Prop. 5th ed. 95. As was said in *De Peyster* v. *Michael*, 6 N. Y. 467, 506, a right of reëntry "is not a reversion, nor is it the possibility of reversion, *nor is it any estate in the land*. It is a mere right or chose in action, and, if enforced, the grantor would be in by a forfeiture of a condition, and not by a reverter. . . . It is only by statute that the assignee of the lessor can reënter for condition broken. But the statute only authorized the transfer of the right, and did not convert it into a reversionary interest, nor into any other *estate*. . . . When property is held on condition, *all the attributes and incidents of absolute property belong to it until the condition be broken*." Had the State through its agents cut timber upon these lands, an action would have lain by the United States upon the covenant of the State that the lands should be held for railway purposes only, and devoted to no other use or purpose; but the State was not responsible for the unauthorized acts of a mere trespasser, and it was no violation of its covenant that another person had stripped the lands of its timber.

In the case of *Schulenberg* v. *Harriman*, 21 Wall. 44, an act immediately preceding this, granting public lands to the State of Wisconsin to aid in the construction of railroads in that State, and precisely similar to this act in its terms, was construed by this court as a grant *in præsenti* of title to the odd sections designated, to be afterwards located; that when the route was fixed their location became certain, and the title, which was previously imperfect, acquired precision and became attached to the lands. As it is stipulated in this case that the lands from which the timber was cut were a part of the grant of June 3, 1856, to the State of Michigan, and were a part of the lands within the six-mile limit, certified and approved to the State by the Secretary of the Interior, no question arises with respect to the identity of the lands.

The case of *Schulenberg* v. *Harriman* was also an action for timber cut upon lands granted to the State, against an agent of the State who had seized the logs, which had been cut after the ten years had expired for the construction of the railroad, but before any action had been taken by Congress

to forfeit the grant. The complaint in the case alleged property and right of possession in the plaintiffs. It was stipulated by the parties that the plaintiffs were in the quiet and peaceable possession of the logs at the time of their seizure by the defendants, and that such possession should be conclusive evidence of title in the plaintiffs against evidence of title in a stranger, unless the defendant should connect himself with such title by agency, or authority in himself. The title of the plaintiffs was not otherwise stated. It was held that the title to the lands did not revert to the United States after the expiration of the ten years, in the absence of judicial proceedings in the nature of an inquest of office, or a legislative forfeiture, and that until a forfeiture had taken place the lands themselves and the timber cut from them were the property of the State. Said Mr. Justice Field, in delivering the opinion of the court, p. 64: "The title to the land remaining in the State, the lumber cut upon the land belonged to the State. Whilst the timber was standing it constituted a part of the realty; being severed from the soil its character was changed; it became personalty, but its title was not affected; it continued as previously the property of the owner of the land, and could be pursued wherever it was carried. All the remedies were open to the owner which the law affords in other cases of the wrongful removal or conversion of personal property." The same rule regarding the construction of this identical land grant was applied by this court in *Lake Superior Ship Canal &c. Co.* v. *Cunningham,* 155 U. S. 354. Indeed, the principle is too well settled to require the citation of authorities. The case of *Schulenberg* v. *Harriman,* 21 Wall. 44, differs from the one under consideration in the fact that no act forfeiting the grant was ever passed; but it is pertinent as showing that under a statute precisely like the present the title to the timber cut before such forfeiture is in the State and not in the General Government.

It follows that the United States, having no title to the lands at the time of the trespass and no right to the possession of the timber, are in no position to maintain this suit. Neither a deed of land nor an assignment of a patent for an

invention carries with it a right of action for prior trespasses or infringements. Such rights of action are, it is true, now assignable by the statutes of most of the States, but they only pass with a conveyance of the property itself where the language is clear and explicit to that effect. 1 Chitty on Pleading, 68; *Gardner* v. *Adams*, 12 Wend. 297, 299; *Clark* v. *Wilson*, 103 Mass. 219, 223; *Moore* v. *Marsh*, 7 Wall. 515; *Dibble* v. *Augur*, 7 Blatchf. 86; *Merriam* v. *Smith*, 11 Fed. Rep. 588; *May* v. *Juneau County*, 30 Fed. Rep. 241; *Kaolatype Engraving Company* v. *Hoke*, 30 Fed. Rep. 444.

So where a landowner entrusts another with the possession of his lands, either by lease, by contract to sell, or otherwise, the right of action for trespasses committed during such tenancy belongs to the latter, and except under special circumstances an action for a trespass, such as the cutting of timber, will not lie in favor of the landlord. *Greber* v. *Kleckner*, 2 Penn. St. 289; *Campbell* v. *Arnold*, 1 Johns. 511; *Tobey* v. *Webster*, 3 Johns. 468; *Cutts* v. *Spring*, 15 Mass. 135; *Lienow* v. *Ritchie*, 8 Pick. 235; *Ward* v. *Macauley*, 4 T. R. 489; *Revett* v. *Brown*, 5 Bing. 7; *Harper* v. *Charlesworth*, 4 B. & C. 574; *Graham* v. *Peat*, 1 East, 244; *Lunt* v. *Brown*, 13 Maine, 236; 2 Greenlf. on Ev. § 616.

Although, as was said by Lord Kenyon in *Ward* v. *Macauley*, 4 T. R. 489, " the distinction between the actions of trespass and trover is well settled : The former are founded on possession ; the latter on property ; " yet, they are concurrent remedies to the extent that, wherever trespass will lie for the unlawful taking and conversion of personal property, trover may also be maintained. The plaintiff is bound to prove a right of possession in himself *at the time of the conversion*, and if the goods are shown to be in the lawful possession of another by lease or similar contract, he cannot maintain trover for them. *Smith* v. *Plomer*, 15 East, 607; *Wheeler* v. *Train*, 3 Pick. 255; *Gordon* v. *Harper*, 7 T. R. 9; *Ayer* v. *Bartlett*, 9 Pick. 156; *Fairbank* v. *Phelps*, 22 Pick. 535.

It does not aid the plaintiffs' case to take the position (the soundness of which we by no means concede) that the State held the lands as trustee, to deliver them over to the railroads

upon certain contingencies, and to return them to the United States in case the condition subsequent were not performed, since nothing is better settled than that a trustee has the legal title to the lands, and that actions at law for trespasses must be brought by him, and by him alone. 1 Perry on Trusts, sec. 328, and cases cited; *Fenn* v. *Holmes*, 21 How. 481.

Certain cases having a contrary bearing will now be considered. Several of these are to the effect that if a man leases an estate for a term of years and the tenant unlawfully cuts timber the lessor may sue in trespass, and perhaps in trover, upon the ground that the title to the land remains in the lessor during the pendency of the lease.

In *Richard Liford's case*, 11 Coke Rep. 46, which was an action of trespass by a tenant against the agent of the owner of the inheritance for certain trees cut, it was said "that when a man demises his land for life or years the lessee has but a particular interest in the trees, but the general interest of the trees remains in the lessor; for the lessee shall have the mast and fruit of the trees, and shadow for his cattle, etc., but the interest of the body of the trees is in the lessor as parcel of his inheritance; and this appears in 29 H. 8 Dyer, 36, where it is held in express words that it cannot be denied that the property of great trees, *scil.* the timber, is reserved by the law to the lessor, but he cannot grant it without the termor's license, for the termor has an interest in it, *scil.* to have the mast and fruit growing upon it, and the loppings thereof for fuel, but the very property of the tree is in the lessor as annexed to his inheritance." Again, speaking of disseisin and the respective rights of the disseisee and disseisor when the former regains possession, it is said: "That after the regress of the disseisee the law adjudges as to the disseisor himself, that the freehold has continued in the disseisee, which rule and reason doth extend as well to corn as to trees or grass, etc. The same law, if the feoffee, or lessee, or the second disseisor, sows the land, or cuts down trees or grass, and severs, and carries away, or sells them to another, yet after the regress of the disseisee, he may take as well the corn as the trees and grass to what place soever they are carried; for the regress

of the disseisee has relation as to the property, to continue the freehold against them all in the disseisee *ab initio*, and the carrying them out of the land cannot alter the property."

. In *Gordon* v. *Harper*, 7 T. R. 9, it was held that where goods had been leased as furniture with a house, and had been wrongfully taken in execution by the sheriff, the landlord could not maintain trover against the sheriff, pending the lease, because he did not have the right of possession as well as the right of property at the time. The case was distinguished from one where the thing was attached to the freehold, and the doctrine of *Liford's case* was reiterated, that where timber is cut down by a tenant for years the owner of the inheritance may maintain trover for the timber notwithstanding the lease, because the interest of the lessee in it remained no longer than while it was growing on the premises and determined instantly when it was cut down. See also *Mears* v. *London & Southern Railway*, 11 C. B. [N. S.] 850; *Randall* v. *Cleaveland*, 6 Conn. 328; *Elliot* v. *Smith*, 2 N. H. 430; *Starr* v. *Jackson*, 11 Mass. 519.

. These cases obviously have no application to one where there has been a conveyance of the fee of the land prior to the cutting of the timber, and no reëntry or analogous proceeding on the part of the vendor for a breach of a condition subsequent.

The same distinction was taken in *Farrant* v. *Thompson*, 5 B. & Ald. 826, in which certain mill machinery, together with the mill, had been demised for a term to a tenant, and he, without permission of his landlord, severed the machinery from the mill, and it was afterwards seized under execution by the sheriff and sold by him. It was held that no property passed to the vendee, and the landlord was entitled to bring trover for the machinery, even during the continuance of the term, upon the ground that the machinery attached to the mill was a part of the inheritance which the tenant had a right to use, but not to sever or remove.

So in *United States* v. *Cook*, 19 Wall. 591, it was held that timber standing upon lands, occupied by Indians, cannot be cut by them for the purposes of sale, although it may be for

the purpose of improving the land, as the Indians had only the right of occupancy, and the presumption was against their authority to cut and sell the timber. In such case the property in the timber does not pass from the United States by severance, and they may maintain an action for unlawful cutting and carrying it away. To the same effect is *Wooden Ware Co.* v. *United States*, 106 U. S. 432.

In *Wilson* v. *Hoffman*, 93 Michigan, 72, the same principle was extended to a plaintiff in ejectment who was held entitled to maintain an action for trover for logs cut by the defendant during the pendency of the suit which had been determined in the plaintiff's favor, although the defendant was in possession of the land under a *bona fide* claim of title adverse to the plaintiff. This is but another application of the doctrine which allows the plaintiff in ejectment to recover mesne profits upon the theory that the land has always been his, and that the defendant illegally obtained possession of it. See also *Morgan* v. *Varick,* 8 Wend. 587; *Busch* v. *Nester,* 62 Michigan, 381; 70 Michigan, 525.

In *Mooers* v. *Wait*, 3 Wend. 104, a person entered into possession of wild lands under a contract of sale giving him the right of entry and occupancy, reserving to the landlord the land as security until the payment of the consideration by withholding the deed. It was held that he had a right to enter and enjoy the land for agricultural purposes, but that he had no right to cut timber for any other purpose than for the cultivation, improvement and enjoyment of the land as a farm; and that the owner of the inheritance, who had never parted with his title, might maintain an action of trover for it against any one in possession, although a *bona fide* purchaser under the occupant. This was also upon the principle that the vendor had never parted with title to his land. But see *Scott* v. *Wharton*, 2 Hen. & M. 25; *Moses* v. *Johnson*, 88 Alabama, 517.

In *Burnett* v. *Thompson*, 6 Jones, N. C. (Law), 210, the plaintiff had a life estate *pur autre vie* in a lease of Indian lands for ninety-nine years, and also a reversion after the expiration of the term. A stranger entered and cut down

cypress trees and carried them off. The plaintiff was permitted to recover. It was held that "if there be a tenant for years or for life, and a stranger cuts down a tree, the particular tenant may bring trespass, and recover damages for breaking his close, treading down his grass, and the like. But the remainderman, or reversioner in fee, is entitled to the tree, and if it be converted may bring trover and recover its value. The reason is, the tree constituted a part of the land, its severance was waste, which is an injury to the inheritance, consequently the party in whom is vested the first estate of inheritance, whether in fee simple or fee tail (for it may last always), is entitled to the tree, as well after it is severed, as before; his right of property not being lost by the wrongful acts of severance by which it is converted into a personal chattel." See also *Halleck* v. *Mixer*, 16 California, 574.

While these cases run counter to some of those previously cited, they are all distinguishable from the one under consideration in the fact that the plaintiff was the owner of the inheritance, and had the legal title to the land at the time the trespass was committed. We see nothing in them to disturb the doctrine announced by this court in *Schulenberg* v. *Harriman*, 21 Wall. 44, that timber cut upon the lands prior to the forfeiture belongs to the State. The fact is that nothing remained of the original title of the United States but the possibility of a reversion, a contingent remainder, which would be an insufficient basis for an action of trover. *Gordon* v. *Lowther*, 75 N. C. 193; *Matthews* v. *Hudson*, 81 Georgia, 120; *Farabow* v. *Green*, 108 N. C. 339; *Sager* v. *Galloway*, 113 Penn. St. 500. To sustain this action there must be an immediate right of possession when the timber is cut. This might arise if the severance of the timber involved a breach of obligation on the part of the tenant, but if the timber were cut by a third person, the question would be as to the right to the timber so cut as against the trespasser, and unless the case of *Schulenberg* v. *Harriman* is to be overruled, it must be held to be that of the State.

2. As the United States can take title to the timber in-

volved in this case only through its ownership of the lands, it remains to consider whether the act of March 2, 1889, c. 414, 25 Stat. 1008, forfeiting the lands granted by this act to aid in the construction of a railroad from Marquette to Ontonagon, operated by relation to revest in the United States title to the timber which had been cut during the winter of 1887 and 1888, and prior to the act of forfeiture. This act provided that "there is hereby forfeited to the United States, and the United States hereby resumes title thereto, all lands heretofore granted to the State of Michigan . . . which are opposite to and coterminous with the uncompleted portion of any railroad, to aid in the construction of which said lands were granted or applied, and all such lands are hereby declared to be a part of the public domain."

The position of the plaintiffs must necessarily be that this act of forfeiture not only revested in the United States the title to the lands as of a date prior to the cutting of the timber in question, but also revested them with the property in the timber which had been cut while the lands belonged to the State of Michigan. Had this act of forfeiture not been passed, there could be no question that, under the case of *Schulenberg* v. *Harriman*, 21 Wall. 44, this timber would have belonged to the State of Michigan, and no action therefor could have been brought by the United States.

But conceding all that is contended for by the plaintiffs with respect to the revestiture of the title to the lands by this act, it does not follow that the title to the timber which had been cut in the meantime was also revested in the United States. As was said in *Schulenberg* v. *Harriman*, the title to the timber remained in the State after it had been severed. But it remained in the State as a separate and independent piece of property, and if the State had elected to sell it, a good title would have thereby passed to the purchaser, notwithstanding the subsequent act of forfeiture. It did not remain the property of the State as a part of the lands, but as a distinct piece of property, although the State took its title thereto through and in consequence of its title to the lands. From the moment it was cut, the State was at liberty to deal with

it as with any other piece of personal property. *Robert* v.
*Hurdle*, 48 N. C. 490.

We know of no principle of law under which it can be said
that timber, which was the property of the State when cut,
becomes the property of the United States by an act of Con-
gress resuming title to the land from which it was cut, al-
though the timber may in the meantime have been removed
hundreds of miles from the lands, and passed into the hands
of one who knew nothing of the source from which it was
derived.    It may be, in such a case, that if the State sues for
and recovers the value of such timber, it might be accountable
to the United States for the proceeds, in case the Government
resumed title to the lands.

Two cases cited by the Solicitor General in the brief lend
support to the doctrine that the resumption of title by the
United States operates upon the timber already cut as well as
upon the lands.    In the first of these, *Heath* v. *Ross*, 12 Johns.
140, the action was in trover for a quantity of timber cut upon
lands for which the plaintiff had applied for a patent before
the timber was cut.    The patent was not granted until after
the timber was cut.    The patent was held, upon well-settled
principles, to relate back to the date of application.    The de-
fendant knew he had no title to the lot or right to cut the
timber.    The plaintiffs were held entitled to recover.

The other case is that of *Musser* v. *McRae*, 44 Minnesota,
343.    In that case an act of Congress, granting lands to the
State of Wisconsin in aid of the construction of railroads, pro-
vided that it should be lawful for the agents appointed by the
railway company, entitled to the grant, to select, subject to
the approval of the Secretary of the Interior, from the public
lands of the United States, " deficiency " lands within certain
indemnity limits.    It was *held* that the issuance of a patent
to the railway company for the lands so selected was evidence
that the company had complied with all the conditions of the
grant, and was entitled to the lands described therein, and
that the title passed from the United States at the date of the
selection.    And it was further held that where, after the lands
had been so selected, but prior to the issue of the patent,

timber had been wrongfully cut and removed by trespassers, the title acquired by the patents must be held to relate back to the selection of the lands, so as to save the purchasers to whom the lands had been granted, a right of action for the timber wrongfully removed from the land, or its value.

These cases are distinguishable from the one under consideration in the fact that the plaintiffs had an inchoate title to the lands — a title which no one could disturb, and which the State was bound to perfect by the issue of a patent, provided the plaintiffs followed up their application. We do not think the doctrine of these cases ought to be extended.

3. Nor are the plaintiffs entitled to avail themselves of the rule that in an action of trover a mere trespasser cannot defeat the plaintiff's right to possession by showing a superior title in a third person without showing himself in privity or connecting himself with such third person. The cases in which this principle is applied are confined to those where the plaintiffs were either in possession of the property or entitled to its immediate possession, and thus showed a *prima facie* right thereto. It has no application to cases wherein the plaintiff has shown no such right to bring the action. *Jeffries* v. *Great Western Railway Co.*, 5 El. & Bl. 802; *Weymouth* v. *Chicago & Northwestern Railway*, 17 Wisconsin, 567; *Wheeler* v. *Lawson*, 103 N. Y. 40; *Halleck* v. *Mixer*, 16 California, 574; *Terry* v. *Metevier*, 104 Michigan, 50; *Stevens* v. *Gordon*, 87 Maine, 564; *Fiske* v. *Small*, 25 Maine, 453. Counsel are mistaken in supposing that the plaintiffs had an immediate right to the possession of this timber. They had no right to the possession of the land until Congress passed the act of March 2, 1889, forfeiting the grant. Up to that time the title was in the State, and until then the United States had no more right to enter and take possession than they would have had to take possession of the property of a private individual.

As the plaintiffs failed to show title to or right of possession to the timber in question, there was no error in the action of the Court of Appeals, and its judgment is therefore

*Affirmed.*

MR. JUSTICE WHITE, with whom concurred MR. CHIEF JUS-
TICE FULLER and MR. JUSTICE HARLAN, dissenting.

The United States donated the land from which the timber
was cut to the State of Michigan in aid of a contemplated
railroad. The donating act dedicated the property thus con-
veyed to the State, for the sole purpose of aiding in the
construction of the railroad, and it contained a provision that
if the road was not built within a designated period the.
land conveyed was to revert to the United States. The road
was never built, and the granted land was forfeited by act of
Congress, because of non-compliance with the conditions con-
tained in the grant.

The issue presented for decision is the right of the United
States to recover in an action of trover the proceeds of timber
cut from the land by a trespasser whilst the legal title was in
the State, but after the period had elapsed when the right in
the United States to assert a forfeiture had arisen. The de-
cision of the court is that a recovery cannot be had, because
at the time of the severance of the timber by the trespasser
the legal title was in the State. It is thus in effect decided
that it was in the power of a trespasser, while the legal title
to the land and its incidents was in the State, to destroy the
value of the land by severing and appropriating the timber,
and that there exists no remedy by which the right of prop-
erty of the United States can be protected. Such a conse-
quence strikes me as so abnormal that I cannot bring my
mind to assent to its correctness; and thinking as I do that it
involves a grave denial of a right of property, not only harm-
ful in the case decided, but harmful as a precedent for cases
which may arise in the future, I state the reasons for my
dissent.

At the outset it becomes necessary to determine the nature of
the rights of the State and those of the United States created
by and flowing from the act of donation. That the land from
which the timber was cut belonged to the United States at
the time of the grant goes without saying. It was conveyed
by the act of Congress to the State, not for the use and bene-

fit of the State, but for the sole purpose of aiding in the construction of a railroad. The State had no right to dispose of the land except for the declared object; and whilst it is true that a power to sell the land was vested by the act in the State, it was a power which the State could only call into being as the work progressed, and, to quote from the act, "for the purposes aforesaid and no other" — that is, the specific object stated, namely, the construction of the railroad referred to. The granting act clearly imported that in the event of a forfeiture before the land had been earned and conveyed by the State, the land should be restored to the United States in its integrity.

I submit that the effect of the act of Congress was to create a trust in the land and to vest the legal title thereto, with the incidents such as timber, in the State of Michigan for the purposes of the trust, to hold, primarily, for the benefit of the owners of a line of railroad if constructed, and, secondarily, for the benefit of the United States, in the contingency that a forfeiture was declared for a breach of the condition subsequent as to the time of completion of the road. The State, in all reason, was bound to restore the land and timber which passed to its possession to the United States, upon the declaration of the forfeiture, retaining no benefit whatever from the land for itself by reason of such custody and control. Being clothed with the legal estate in the land, the State, while it so held the land, "possessed all the power and dominion over it that belonged to an owner." *Stanley* v. *Colt*, 5 Wall. 119, 167. As the timber when severed belonged to the true owner of the land, the State, as the trustee of an express trust and representing such owner, was the proper party, during the continuance of the trust, to recover any portion of the inheritance wrongfully converted by a trespasser, and this would have been the case even if the United States had stipulated to retain possession until a conveyance of the land by the State. *Wooderman* v. *Baldock*, 8 Taunt. 676; *White* v. *Morris*, 11 C. B. 1015; *Barker* v. *Furlong*, (1891) L. R. 2 Ch. 172; *Myers* v. *Hale*, 22 Mo. App. 204. Clearly this was so, because, to maintain replevin or trover, it is essential that the plaintiff

have *at the time of suit brought* the legal title to the property, and, until the enactment of the forfeiting act, the legal title to this timber was in the State of Michigan.

It was manifestly because the legal title was in the State that this court in *Schulenberg* v. *Harriman*, 21 Wall. 44, declared that a State was the owner of timber which had been wrongfully cut by trespassers from land granted in aid of a railroad by a statute similar to the one above referred to. The Schulenberg action was instituted, however, at a time when no forfeiture had been declared, and the controversy was simply between a trespasser and the State as to their respective rights in timber which had been unlawfully severed from the granted land. That land so conveyed, with all that formed part thereof, was deemed to be held upon trust is manifest from the opinion ; for, speaking through Mr. Justice Field, the court said (p. 59):

" The acts of Congress made it a condition precedent to the conveyance by the State of any other lands that the road should be constructed in sections of not less than twenty consecutive miles each. No conveyance in violation of the terms of those acts, the road not having been constructed, could pass any title to the company."

And this view was reiterated by this court, speaking through Mr. Justice Brewer, in *Lake Superior Ship Canal &c. Co.* v. *Cunningham*, 155 U. S. 354, when, in interpreting the very statute now under consideration, it was said (p. 373):

" Further the grant to the State of Michigan was to aid in the construction of a railroad. Affirmatively, it was declared in the acts of Congress that the lands should be applied by the State to no other purpose. Even if there had been no such declaration such a limitation would be implied from the declaration of Congress that it was granted for the given purpose. As the State of Michigan had no power to appropriate these lands to any other purpose, certainly no act of any executive officer of the State could accomplish that which the State itself had no power to do."

To reason, however, to establish that in so far as the granting act restricted the State to the use of the land and that

which adhered in it for a particular purpose it engendered an express trust, is wholly unnecessary, since it is admitted that had the State through its agents cut timber upon the land before the passage of the forfeiture act, a right of action would have arisen on behalf of the United States against the State as upon a covenant by the State that it would keep the land and its incidents for railway purposes only. This conclusion necessarily carries with it as a legal resultant the proposition that the granting act contained an express trust. How then, I submit, can it in reason be held that there was a right which could only exist upon the hypothesis of an express trust arising from the granting act, and yet it at the same time be decided that there was no trust whatever implied in the act, or that the rights which would obtain if there were a trust have no being? It cannot be doubted that the act restricted the use to a particular purpose, nor can it be gainsaid that the right of reëntry was stipulated only as respects the non-completion of the railroad. But the failure to preserve a right of reëntry in case of the misuse of the property did not destroy the terms of the act restricting the use, and as therefore the restriction as to use was unaccompanied with a clause of reëntry, the effect was to give rise to a trust upon the grantee with reference to such use. This last principle, I submit, is sustained by authority. *Stanley* v. *Colt*, 5 Wall. 119, 165 ; *Packard* v. *Ames*, 16 Gray, 327, and cases cited ; *Sohier* v. *Trinity Church*, 109 Mass. 119.

As the State held the land with power simply to sell on the happening of a particular event, until the occurrence of that event the State had no greater rights in the land than would have existed in favor of one who was entitled to the mere use and occupancy of the land. It could not therefore sell the timber for purposes of mere profit, for, as said in *United States* v. *Cook*, 19 Wall. 591 :

"The timber while standing is a part of the realty and can only be sold as the land could be. The land cannot be sold, . . . consequently the timber, until rightfully severed, cannot be."

If, therefore, the State could not rightfully acquire the

absolute ownership, in its own right, of timber, the cutting of which it had authorized, it is clear that it would not become such owner by reason of the unlawful act of an unauthorized person. As the State of Michigan was without power to have authorized a sale of the timber contrary to the purpose of the trust, it is obvious that the act of a mere trespasser, without authority from the State, in denuding the land of its timber, could not operate to vest the State or the trespasser with the absolute ownership, in its or his own right, of said timber; and it is the settled doctrine of this court that the sale of timber by a trespasser does not divest the title of the real owner, and that a purchaser, even though acting in good faith, is liable to respond to the true owner for the timber or its value. *United States* v. *Cook*, 19 Wall. 591; *Wooden Ware Co.* v. *United States*, 106 U. S. 432; *Stone* v. *United States*, 167 U. S. 178, 192, 195.

The simple question presented then is this and this alone: Where the legal title to land, with its incidents, is in one person burdened with an express trust in favor of another, can the *cestui que trust*, upon the cessation of the trust, when the title to the land and its incidents has revested in him, recover from a wrongdoer the value of timber cut, without color of right and unlawfully removed from the land while the legal title and possession thereto was in the trustee?

This question is, I think, fully answered by the rulings of this court in *Schulenberg* v. *Harriman* and *Lake Superior &c. Co.* v. *Cunningham, supra,* because, as already stated, in the first case it was said that "no conveyance in violation of the terms of these acts, the road not having been constructed, could pass any title to a grantee of the State;" and in the second, that, "As the State of Michigan had no power to appropriate these lands to any other purpose, certainly no act of any executive officer of the State could accomplish that which the State itself had no power to do." Now, no one will gainsay that this court in those cases declared that if the land was conveyed in violation of the terms of the act of Congress, an occupant under such an unlawful grant might be ousted by the United States, either forcibly

or by suit in ejectment. With this doctrine thus settled by this court in opinions which are now approvingly cited, is it yet to be held that if the occupant under a void grant from the State before forfeiture denuded the land of all its timber, that is, of one of its material incidents, the land might be recovered by the United States from the trespasser, but not the timber or its value? I submit that, upon general considerations, as between the wrongdoer and the *cestui que trust*, the better right is in the latter, that such right can be enforced, and that though ordinarily in an action of trover it is essential that the plaintiff should have had at the time of the unlawful conversion the legal title and right of possession to the property claimed by him, yet, under such circumstances as I have indicated, a title by relation is a sufficient basis for the action.

Relation is a fiction of law, adopted solely for the purposes of justice, *Gibson* v. *Chouteau,* 13 Wall. 92, 100, and by it one who equitably should be so entitled is enabled to assert a remedy for an injury suffered, which otherwise would go unredressed. The doctrine is considered at much length in *Butler* v. *Baker*, 3 Coke, 25, in resolutions of the Justices of England and the Barons of the Exchequer, and "many notable rules and cases of relations" (p. 35*b*) are there stated. The action was trespass, and the refusal of a wife, after the death of the husband, to accept a jointure by which an estate tail had vested in her prior to the death of the husband, was held to relate back as to certain lands and not as to others. It was laid down (p. 28*b*) "that relation is a fiction of law to make a nullity of a thing *ab initio* (to a certain intent), which *in rei veritate* had essence, and the rather for necessity, *ut res magis valeat quam pereat.*" And, in Lord Coke's comments on the case, he observes (p. 30*a*): "The law will never make any fiction, but for necessity, and in avoidance of a mischief."

Early in England the doctrine of relation was applied in favor of the king in cases where until office found the title or right of possession to property, real or personal, was not in the crown. Thus Viner in the eighteenth volume of his Abridgment, at p. 292, title Relations, states the following case:

"2. In *quare impedit*, where the king is entitled to the

advowson by office by death of his tenant, the heir being within age and in ward of the king by tenure in capite, this office shall have relation to the death of the tenant of the king; so that if there be a mesne presentment the king shall avoid it by relation. (Br. Relations, pl. II, cites 14 H. 7, 22.)"

Several instances of the application of the doctrine in favor of the king are referred to at length in the report of the case of *Nichols* v. *Nichols*, Plowden, 477, 488 *et seq.*, one of which, I submit, is precisely parallel to the case at bar, and is thus stated in the report:

"In an action of trespass brought in 19 Edw. IV, for entering into a close and taking the grass, the defendant pleaded that it was found by office that the tenement escheated to the king before the day of the trespass, and there it seems that, as to such things as arise from the land, as the grass, and the like, the action which was well given to the plaintiff was taken away by the office found afterwards, which by its relation entitled the king thereto; but, as to the entry into the land, or breaking of fences, which don't arise from the land, nor any part of the annual *encrease* of it, the action was not taken away by the office."

This last case is reviewed, approvingly, in the opinion of Bayley, J., in *Harper* v. *Charlesworth*, 4 B. & C. 574, where, in an action of trespass, brought by one in the possession of lands under a parol license from agents of the crown, which possession was not good as against the crown because not granted in conformity to statute, it was adjudged that, as the king had not proceeded against the occupant, the action might be maintained, though the right of such occupant to recover for the trees was denied in the opinion of Holroyd, J., presumably because they form part of the inheritance.

The doctrine was early enforced in England to vest a right of action, in trover, in an administrator. In 18 Viner's Abr., title Relation, p. 285, it is said:

"(1. If a man dies possessed of certain goods, and after a stranger takes them and converts them to his own use, and then administration is granted to J. S., this administration shall relate back to the death of the testator, so that J. S.

may maintain an action of trover and conversion for this conversion before the administration granted to him. Trin. 10 Car. B. R. between Locksmith and Creswell adjudged, this being moved in arrest of judgment, after verdict for the plaintiff. Intratur. Hill, 9 Car. Rot. 729.)"

In the marginal note it is stated: "For this is to punish an unlawful act; but relations shall never divest any right legally vested in another between the death of the intestate and the commission of administration."

An administrator has likewise been held, by relation, to have such constructive right of possession in the goods of the intestate before grant of letters as to be entitled to maintain an action of trespass. *Tharpe* v. *Stallwood*, 5 M. & G. 760, and cases there cited. And, in *Foster* v. *Bates*, 12 M. & W. 226, Parke, B., said (p. 233):

"It is clear that the title of an administrator, though it does not exist until the grant of administration, relates back to the time of the death of the intestate; and that he may recover against a wrongdoer who has seised or converted the goods of the intestate after his death, in an action of trespass or trover. All the authorities on this subject were considered by the Court of Common Pleas, in the case of *Tharpe* v. *Stallwood*, 12 Law J. N. S. 241, (a) where an action of trespass was held to be maintainable. The reason for this relation given by Rolle, C. J., in *Long* v. *Hebb*, Styles, 341, is, that otherwise there would be no remedy for the wrong done."

The title of an assignee in bankruptcy was also early held to relate back, for the purpose of maintaining trover, to the time of the commission of the act of bankruptcy. See the subject reviewed in *Balme* v. *Hutton*, 9 Bing. 471, particularly pp. 524, 525, where Tindal, C. J., observed that in *Brassey* v. *Dawson*, 2 Str. 978, Lord Hardwicke, then Chief Justice of the King's Bench, stated this relation to be a fiction of law, but that, subsequently, when Chancellor, in *Billon* v. *Hyde*, 2 Ves. 310, he seemed to be of opinion that the terms of the bankrupt act, by necessary construction, imported that such relation was intended.

Another illustration of the application of the doctrine is

where a grantee or mortgagee ratifies an unauthorized delivery of a conveyance or mortgage to a third person, in which case it is held that the title may relate back to the unauthorized delivery, except as to vested rights of third persons. See a review of numerous authorities in *Rogers* v. *Heads Iron Foundry*, 51 Nebraska, 39. See, also, *Wilson* v. *Hoffman*, 93 Michigan, 72, where it was held that a successful plaintiff in ejectment might maintain an action of trover for logs cut by the defendant from standing timber, and removed from the land during the pendency of the suit, and while in possession of the land under a *bona fide* claim of title adverse to the plaintiff. In that case the court said (p. 75):

" In the present case the true owner brings trover against the party who cut the logs, under a *bona fide* claim of title adverse to the owner, after the title to the land has been determined in favor of the plaintiff. . . . If in the present case the logs had been upon the land when the ejectment suit was determined, that determination would have established the title in the plaintiff. Suppose, however, that before the determination of the ejectment suit the logs had been skidded upon adjoining land — would the ownership or right of possession depend upon which party first reached the skids? As is said in the *Busch case*, as between the wrongdoer and the true owner of the land, the title to what is severed from the freehold is not changed by the severance, whatever may be the case as to strangers. If the true owner may keep his own property when he gets it, why may not he get it if another has it?"

Many decisions of this and other courts illustrate the application of the doctrine to various conditions of fact. Thus, where one has claimed land under a donation act, or has entered upon land under homestead or preëmption statutes, the legal title subsequently acquired by patent has been held to relate back to a prior period, to quote the language of this court in *Gibson* v. *Chouteau*, 13 Wall. 100 : " So far as it is necessary to protect the rights of the claimant to the land, and the rights of parties deriving their interests from him."

Among the cases recognizing and applying the doctrine

that the legal title when acquired may be held, for certain purposes, to relate back to the inception of an inchoate right in the land, which, however, was in no sense an estate in the land, may be cited the following: *Ross* v. *Barland,* 1 Pet. 655; *Landes* v. *Brant,* 10 How. 348; *Lessee of French* v. *Spencer,* 21 How. 228, 240; *Grisar* v. *McDowell,* 6 Wall. 363; *Beard* v. *Federy,* 3 Wall. 478; *Lynch* v. *Bernal,* 9 Wall. 315; *Stark* v. *Starrs,* 6 Wall. 402; *Gibson* v. *Chouteau,* 13 Wall. 92, 100; *Shepley* v. *Cowan,* 91 U. S. 330; *Heath* v. *Ross,* 12 Johns. 140; and *Musser* v. *McRae,* 44 Minnesota, 343. As was said in *Gibson* v. *Chouteau, supra,* p. 101, the doctrine of relation is "usually" applied in this class of cases, but is so applied "for the purposes of justice." I submit it is clear that the inchoate rights in land held in the cases above cited to be sufficient to warrant the application of the doctrine of relation were of no greater legal or equitable merit or efficacy than the interest or expectant right in land with its incidents, reserved to the United States by virtue of the granting act of 1856 here considered, and this it strikes me is patent when it is borne in mind that it is conceded that the interest of the United States in the land was such that, if the timber had been cut by the State, the United States had the better right to the avails, and might, by an action for breach of covenant, recover the same from the State. But, if the State, which held the legal title subject to an express trust, can be held to account by way of damages in an action of covenant for timber cut under its authority, why "for the purposes of justice" should not the doctrine of relation be applied in favor of the United States, at this time when, otherwise, a naked trespasser, who had no title of any kind and whom the State whilst it was trustee choose not to sue and cannot now sue, will escape liability and the United States be defrauded of the value of its property? To deny relief under such a state of facts is, I submit, to hold that if A conveys land in fee to B in trust, to be held for C until the happening of a certain event, and, after the contingency has happened, and the land has been conveyed to C and the trust thus terminated, the former *cestui que trust* discovers that the land had been stripped of all its timber

Dissenting Opinion: White, J., Fuller, C.J., Harlan, J.

by a trespasser and rendered practically valueless, he is without remedy, and must endure the pecuniary injury without complaint.

If, as it seems to me is clearly the fact, the State of Michigan held title to the timber merely as an incident to the land, and could only exercise such powers with respect to the timber as it was entitled to exercise as respects the land itself, it results that the State did not stand in the attitude of a grantee of land upon condition subsequent, to whom an *absolute* conveyance had been made, *for its sole use and benefit.* Authorities, therefore, to the point that in the case of *such* a conveyance, the only right of the grantor is to receive back, upon reëntry, the granted land in the condition in which it might then exist, have no pertinency in a case like the present, where the grant was to the State, not as absolute owner, but as a mere trustee. So, also, I submit that decisions which hold that upon the commission of a trespass on land where the legal title and possession is in the real owner, or upon an infringement of a patent the legal title to which is in the real owner, a right of action to recover damages for the trespass or infringement immediately vests in such owner and becomes personal to him, so as not to pass upon a subsequent conveyance of the land or assignment of the patent, have no relevancy in cases like that at bar, where at the time of the trespass or infringement complained of the legal title and the possession was held by one who was but a trustee for another, and had no real, beneficial interest in the land.

Nor can I see the appositeness of the citation of authorities holding that, during the existence of a trust, the trustee and not the *cestui que trust* is the proper person to sue. This is readily conceded, and such was the decision of this court in *Schulenberg* v. *Harriman* and in *Lake Superior &c. Co.* v. *Cunningham.* The question here is, not who may sue during the existence of the trust, but, what are the rights of the *cestui que trust* when the power of the trustee has ended, and the property has reverted under the terms of the trust.

The decisions are uniform, that even where land is in the possession of a lessee, upon an unauthorized severance of

growing timber, the title and right of possession to the severed timber is at once vested in the owner of the land, or, as it is sometimes expressed, the owner of the inheritance; and the latter may resort to the appropriate remedies against one who unlawfully removes the severed timber from the land, *Liford's case*, 11 Coke Rep. 46*b*, 48*a*; *Ward* v. *Andrews*, 2 Chitty, 636; *S.C.* 4 Kent Com. 120; *United States* v. *Cook*, 19 Wall. 591, 594; *Burnett* v. *Thompson*, 6 Jones, Law, (N. C.) 210, 213; *Mather* v. *Ministers of Trinity Church*, 3 Serg. & Raw. 509, and cases cited; *Mooers* v. *Wait*, 3 Wend. 104, 108; *Gordon* v. *Harper*, 7 T. R. 13; 1 Chitty Plead. 16th ed. 217; star paging 168; 1 Wash. Real Prop. 5th ed., 498, note *T*, star paging 314; and the same principle applies to whatever is part of the inheritance and is wrongfully severed and removed from the land. *Farrant* v. *Thompson*, 5 B. & Ald. 826, 828.

To summarize, therefore: The State of Michigan was not the beneficial owner of the land from which the timber in question was severed, but held the legal title merely as a trustee, though, by virtue of being vested with the legal estate, the State was entitled to enforce, for the benefit of the real owner, such remedies as the latter might have resorted to had he held the legal title. But if the owner, the United States, is not permitted to maintain the present action, it loses property which it had a clear right to receive, and the wrongdoer goes unpunished. These circumstances present all the elements which justify resort to the fiction of law by which a person who, in equity and good conscience, was the real owner at the time of an unlawful conversion is to be regarded, as against the wrongdoer, to have had the legal title and possession, by relation, in him at the time of such conversion, and therefore as having had such a title and possession as, when his disability to assert his rights no longer exists, will entitle him to maintain an action of trover.

Indeed, it seems to me that in reason it is impossible to deny the right of the true owner to recover the timber, without involving the mind in irreconcilable propositions and in addition making use of a complete *non sequitur*, that is to say, first, that there was no trust, and yet that rights existed

which could only arise by reason of a trust; and second, that the trustee alone could sue during the existence of the trust, therefore, on the termination of the trust, the same doctrine applies. Reduced to its last analysis, the doctrine now announced is, I submit, really this: That the United States could not recover whilst the trust existed because the trustee must assert the right, and that it likewise could not recover after the termination of the trust, and, hence, could not recover at all. The result in effect concedes the existence of a right of property, but holds that it cannot be protected because the law affords no remedy. The maxim *ubi jus, ibi remedium* lies at the very foundation of all systems of law, and, because, as has been stated at the outset, I cannot believe that the common law departs from it, I refrain from giving my assent to the conclusions of the court, and express my reasons for dissenting therefrom.