## THE EDWIN TERRY.

## THE WILLIAM E. CLEARY.

(Circuit Court of Appeals, Second Circuit. May 21, 1908.)

No. 210.

**1. Towage—Making Up of Tow—Duty of Tug.**

While it is the duty of a tug to make up her tow, where there are a number of vessels, by selecting the positions of the different vessels, attending to the leading hawser, and prescribing the distance apart of different tiers, the details, such as making fast breast lines between the boats in a tier, which are familiar to all boatmen, may properly be left to the tows themselves, where they have masters on board.

**2. Same—Sinking of Tow by Ice—Liability of Tugs.**

The injury of a coal barge, after being placed in a tow which was being made up in the Hudson river, by being struck by floating ice, *held* not due to any fault of the tugs, but rather to structural weakness, where she was placed in the usual manner and not exposed more than the other boats, none of which were injured, or to the failure of her master to attach a breast line to the boat alongside, and where the tugs were not chargeable with negligence in making up the tow at the time.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York (145 Fed. 837), holding the tugs liable for injury to the boat W. T. Lewis, which the tug Terry had in tow; said injury being caused by floating ice, which struck the boat on the port corner of her bow and knocked out a plank.

Amos Van Etten, for appellant.

James J. Macklin and La Roy S. Gove, for appellees.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. The accident happened on January 30, 1905, when there was much floating ice in the Hudson river. The Lewis, recently loaded there with coal, lay in the slip at Edgewater, N. J., and was bound for Havemeyer's Sugar Refinery in Williamsburgh. She and others were engaged in supplying the refinery with coal from the Edgewater docks. It appears that on the day in question the refinery had a supply sufficient to last for two or three days, but the tugboat owners were not notified that such was the case, nor was there any objection made to taking the boats in tow. Both parties evidently contemplated that during a severe winter, as this was, there would be many occasions when the tow would be hauled through floating ice, and it was not negligence on the part of the tugs to undertake moving the boats on that day.

The Terry came to Edgewater, called out to those on board the boats to make up just as they lay at the slip, and after a brief absence returned, made fast to the head tier with two hawsers of 25 fathoms, and hauled five boats out into the river, where she waited for the Cleary to bring some more boats to be made fast. The tide was ebb, and the Terry's engines were going at a speed sufficient to

keep the flotilla in place. In the hawser tier there were the Reynolds (port) 'and two Pennsylvania Company boats. In the second tier—five or six feet behind—there were the Lewis, astern of the Reynolds, and the Theresa Hughes alongside. The R. H. Williams tailed behind the Lewis. Much is said in the testimony and on the argument of the circumstance that the Lewis was the largest boat, and of her necessarily projecting beyond the Reynolds. The fact is that she was only a foot wider, so the projection was but six inches. We are not persuaded that the Lewis was placed in "an unsafe position." On the contrary, tailing close behind the Reynolds, she was relieved to a great extent from contact with the floating ice. Indeed, it is difficult to see how she could have been put in any safer position, unless she had been placed in the center and surrounded by all the other boats to act as fenders for her. But no one suggested to those in charge of the tugs that she was so tender as to need this full measure of protection.

It is also contended that the bow of the Lewis kept swinging in and out—"zigzagging," as the pilot of the tug describes it; a circumstance due to the fact that there was no bow breast line between her and the Theresa Hughes. When the pilot of the tug noticed her swinging, he called out to her master to get out a breast line. The latter says he did not hear this hail, but there is no doubt it was given. Witnesses from boats ahead and behind the Lewis heard it, and it was repeated to the latter by the master of the Reynolds. It is charged as a fault that the tug did not herself see to getting out and fastening these lines; but in Myers v. The Lyndhurst, 147 Fed. 110, 77 C. C. A. 336, we held that such is not the rule, where the tow has her own master aboard. It is the duty of the tug to make up the tow; that is, to select the positions to be occupied by its component vessels, to attend to the leading hawser on which they are towed, and to prescribe the distances apart of the different tiers. But the details, which are familiar to every boatman, of making fast the lines which attach his boat to those ahead, behind, or alongside of it naturally and usually are left to those on board the boat so attached. There can be no doubt upon the testimony that vessels about to be towed as these were should have breast lines out to any boat alongside. Even the master of the Lewis does not dispute this, but insists that he "had no show to put lines on the Hughes. The Pennsylvania boat was so short, and the Hughes boat behind was short, and that leaves her stern almost up to my amidships." We cannot accept this explanation, although the witness is voluble in his assertions that the other boats were little ones, asserting that the boat made fast to the Reynolds (and therefore ahead of the Hughes) "was an old plug—wasn't half the size of the Lewis." The evidence shows that the hawser tier was properly made up with breast lines bow and stern; that the Reynolds was 95 feet long, and the Pennsylvania boat next to her 91 feet long; that the boats of second tier tailed behind on hawsers only 5 or 6 feet long; and that the Hughes had a carrying capacity of 300 tons. The Lewis was 108 feet long, but her length is not material. It is manifest, from the dimensions of the other boats and length of hawsers

above set forth, that it was physically impossible for the Hughes to be lapping the Reynolds with her stern amidship of the Lewis. Her bow might have been 5 feet ahead of the bow of the Lewis; but that was no sufficient excuse for not getting out a breast line between them.

We are, moreover, rather inclined to the opinion that the absence of a breast line did not contribute particularly to the disaster. The witness who was most observant of the floe which did the damage was the master of the Reynolds. He saw it come against his own boat, followed it along as it drifted down his side, and stood on the stern watching it. He says: "As it got to the Lewis, it swung in and hit the Lewis." Another witness says it pushed the Reynolds over a little, and so came against the Lewis. When it is remembered that the Terry was not going at speed, but was merely holding her tow against the ebb tide, it would seem a fair inference that the accident happened because the Lewis was not of sufficient structural strength to meet the contacts which she might expect to be exposed to when moving about this harbor in the winter season; but, however that may be, we do not find that the Terry was in fault.

It is contended that the Cleary failed to take proper care of the Lewis after the accident. She towed her to the nearest available mud flat, and stayed by her till 4:30 p. m. (the accident happened about 10 a. m.), "pumping for all she was worth," as the master of the Lewis expresses it. Thereafter, at his request, she took his wife and himself ashore. The boat received some further damage before the wrecking company took hold of her the next day, apparently from moving ice; but we do not see how the Cleary would have prevented that by standing by all night.

The decree is reversed, with costs.