## MONK v. CORNELL STEAMBOAT CO.

(District Court, S. D. New York. December 14, 1909.)

1. TOWAGE (§ 12*) — LIABILITY FOR INJURY TO TOW — NEGLIGENT TOWAGE THROUGH ICE.

Respondent was employed by the charterer of a coal boat to tow her, laden with coal, to its manufacturing plant in Brooklyn. After waiting for two days on account of ice in the harbor, the charterer insisted on having the coal, and two tugs undertook to take the boat through half a mile of ice packed along the shore. One of the tugs went ahead first and broke a lane, but there were still cakes of ice floating therein, by which the boat, which was wider than the tug in advance, was so injured that she sank. The undertaking was dangerous to the boat, and known to be so by the tug masters. *Held* that, although the charterer was equally chargeable with negligence, such fact did not relieve respondent from liability for its negligence to the owner of the boat, who was not a party to the towage contract.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 29; Dec. Dig. § 12.*]

2. TOWAGE (§ 15*)—ACTION FOR INJURY TO TOW—VESSEL UNDER CHARTER.

The owner of a vessel under charter may maintain an action against a tug owner employed by the charterer for its injury through negligent towing, even before the expiration of the term of the charter.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 32; Dec. Dig. § 15.*]

In Admiralty. Suit by Thomas Monk, Jr., against the Cornell Steamboat Company. Decree for libelant.

Mr. Park, for libelant.
Mr. Van Etten, for respondent.

HOUGH, District Judge. This libel is brought to recover for negligent towage through ice under quite unusual circumstances. Libelant is the owner of the boat Monk, which was under charter for a long time to the Edison Company, a corporation having a manufacturing plant at Bay Ridge, Brooklyn. In February, 1908, the ice in New York Harbor along the Brooklyn shore was very heavy. Libelant's boat, having been laden by the charterers with coal for their Bay Ridge factory, was by said charterers put in charge of respondents to be towed to her place of destination. On account of the heavy ice in the harbor, respondents did not move the boat for at least two days, at the end of which time they were informed by charterers that the coal must be delivered at Bay Ridge near the factory there situated or their plant would be obliged to shut down for lack of fuel.

Respondents said it would take two tugs to get the coal boat through, and the reply given was that if it took six tugs the boat must go through and the coal be delivered. Thereupon respondent dispatched the Monk in charge of two tugs, and arrived with her in safety at a point about half a mile off the Bay Ridge wharf. Between this point and the wharf the ice was heavily packed. It is described·by several witnesses as having been originally apparently two to three inches thick, then broken up and packed together by wind and tide

---

until it formed a mass between two and three feet thick, extending solidly along the Long Island shore, and extending out into the bay for about half a mile. Leaving the coal boat in charge of the smaller tug, the larger and more powerful vessel endeavored to make a lane through the ice whereby the wharf might be reached. This larger tug (the Bavier) is of about 250 horse power and 21-foot beam. She ploughed through the above-described half mile of ice, and then came back through the lane she had broken, "skinning along one side" of the same on her return, in order to make it wider, as the Monk was 28 feet wide. To travel this half mile and return occupied 2½ hours —this on account of the thickness of the ice, which repeatedly stopped the Bavier's way and required her to back and ram. When the lane was completed it did not present open water, but was marked by the discoloration of the ice which had been submerged temporarily by the passage of the Bavier. No very large cakes were encountered, but the mass was very solid.

The Monk was in charge of a master appointed and paid by libelant, but obeying the orders of the charterer. He had made no objection to the voyage, although he looked upon it as dangerous. When the Bavier returned from breaking through the ice, she made fast ahead of the Monk by two short hawsers, the helper tug attached herself to the Monk's stern by one hawser, and a system of whistle signals was arranged by which, if the Bavier became stuck in the ice, the helper would go astern in time to prevent the Monk from ramming the stern of the Bavier. The flotilla thus arranged then went through the ice, slowly, but without stoppage, and the master of the helper testifies that he did not start his engines, but was as a matter of fact towed behind the Monk.

It is satisfactorily shown that the coal boat was in good condition and entirely seaworthy, although not new. Before she got through this half mile of ice her captain deposes that he heard water coming into her on her port bow corner. She has a partly rounded bow, and by the corner is meant the place where her rounded bow approaches the straight side. She sank within less than an hour after getting to the wharf, and subsequent investigation showed that on both the port and starboard bows three plank had been crushed in at or near the place of her greatest beam; i. e., where she was about 7 feet wider than the Bavier.

The Monk's master testified, and the libel alleges, that this injury was occasioned, not by the necessary results of the ice contact to which she was subjected, but because her port bow was negligently thrown against unbroken ice, owing to a defective arrangement of the towing hawsers. As the witness put it: "The lane was big enough, if I had been brought through properly." I do not think this allegation sustained. On the contrary, I am convinced that the hawsers were properly made fast, and that the boat did not by any sheer encounter greater dangers on her port side than she did on her starboard. This finding is based, not only on the testimony from the tugs, but by the observed nature of the injuries which sank the Monk. The libel, however, also alleges generally that it was negligent to attempt to tow the boat through the ice as it existed at the time and place in question.

The respondents did not wish to take this boat through the ice. It was done only upon the insistence of the charterers, and when they agreed to make the effort they were quite aware that in so doing they were entering upon a difficult, dangerous, and doubtful operation. In the face, therefore, of known and anticipated danger, they were at least bound to exercise the care which other prudent and intelligent men would ordinarily deem necessary under the same circumstances. The Packer (C. C.) 28 Fed. 160. There was no contract or agreement by the charterers exonerating the tugs from liability for the consequences of lack of care under the circumstances. It remains, therefore, to ascertain from the evidence whether it is fairly shown that respondents failed to do anything which they reasonably might have done, not only with two tugs, but with any number of assisting vessels; for, as above shown, the charterers had given them authority to practically use whatever number of tugs they deemed necessary.

To me the testimony indicates plainly that the ice was of such a character that no blunt-bowed boat could with reasonable safety be towed through it, if required to breast aside the ice in her passage by the strength of her own bow. The Bavier had not succeeded, and could not succeed, in getting the ice out of the lane she had made. Any passing vessel had to shove under the still unbroken ice the partly crushed mass which filled the lane. The Bavier was not wide enough to protect the Monk from this labor. The nature of the injury received is proof that the coal boat was obliged to throw aside ice in her passage. She was not strong enough to do it successfully. Her build did not fit her to do it properly; yet it was obvious that she had to do it, while towing behind a vessel narrower than herself. This method of towing was condemned by this court in The Phœnix, 143 Fed. 350. I see nothing in The Edwin Terry, 162 Fed. 309, 89 C. C. A. 17, and 162 Fed. 311, 89 C. C. A. 19, impugning the authority of The Phœnix, and that case must be followed.

But the decision herein may in my opinion be equally well based on the much broader ground that, under the circumstances existing at the time and place of disaster, it was (with the means at hand) impossible safely to tow the Monk through half a mile of such ice as then lay off Bay Ridge, and that such impossibility was patent to experienced men. This I believe to be the truth, and in fact infer from the testimony of the tug masters that they scarcely more than hoped to get through without injury, and were not surprised by what actually happened. The attempt to get through the ice, however, was made at the request and upon the insistence of the Edison Company, and if that company had owned the boat, or as charterer and bailee had brought this action, they would, under The Phœnix, supra, be entitled to recover only half damages.

This owner libelant, however, is not affected by this ruling. He was out of possession of his boat, and a stranger to the contract between respondent and the Edison Company, which was negligent in respect of his property, resulting in permanent injury thereto. Such a bailor may bring an action based on the negligence, even before the expiration of the term of hire, as was held in Mears v. London & South-

western Ry., 11 C. B. (N. S.) 850 (cited with approval in United States v. Loughrey, 172 U. S. 214, 19 Sup. Ct. 153, 43 L. Ed. 420).

Decree for the libelant, with costs.