William E. Williams, John Crowell and Benjamin Blakesley, Trustees of the Wesleyan Methodist Church of Concord Township, *v.* The Concord Congregational Church, J. H. Barnett, Pastor, Emory McCray, L. McCray and Frank Blakeslee, Trustees, Appellants.

*Equity—Equity practice—Contract—License—Reversal of master.*

Where several religious denominations contributed to the expense of building a church and keeping it in repair, on the agreement that it was to be used by all without interfering with each other, and that one particular denomination which contributed the most was to have the preference as to the time of use, the other denominations have a conceded right to the use of it, not a mere license removable at pleasure.

It is improper for the court of common pleas to reverse a master's finding of fact without assigning any reasons for such reversal.

The Supreme Court will not sustain the action of the common pleas in reversing a master's finding of fact in a suit between two denominations

as to the right of the use to a church building where the testimony is mostly oral and preponderates in favor of a master's finding, and the court below has given no reason for its action.

*Equity—Jurisdiction—Practice.*

Where the question of jurisdiction, although formally pleaded in an answer to a bill in equity, is not pressed before the master or the court below, and not passed upon by them, and a long and expensive hearing has been had, and the want of jurisdiction is at most only doubtful, the Supreme Court will not, on appeal, consider the question of jurisdiction.

*Equity—Equity practice—Cross-bill—Injunction.*

On a bill in equity for an injunction the court cannot award an injunction in favor of the defendants and against the plaintiffs, where the defendants file no cross-bill.

*Equity—Equity practice—Costs.*

Costs cannot be imposed on the defendants in a bill in equity where it appears that they were forced against their will into litigation to maintain a clearly established right.

Argued April 26, 1899. Appeal, No. 167, Jan. T., 1899, by defendants, from decree of C. P. Erie Co., Nov. T., 1893, No. 1, on bill in equity. Before STERRETT, C. J., GREEN, McCOLLUM, DEAN and FELL, JJ. Reversed.

Bill in equity for an injunction. Before MORRISON, J., of the 48th judicial district, specially presiding.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was the decree of the court.

*Frank Gunnison* and *C. L. Covell*, for appellants.—The case presents an ejectment bill to recover a strictly legal right over which a court of equity has no jurisdiction: North Penna. Coal Co. v. Snowden, 42 Pa. 488; Hawley v. Clowes, 2 Johns. Ch. Rep. 122; Coxe v. Smith, 4 Johns. Ch. Rep. 271; Phelps v. Green, 3 Johns. Ch. Rep. 302; Messimer's App., 92 Pa. 168; Barclay's App., 93 Pa. 50.

Manifest want of jurisdiction may be taken advantage of at any stage of the case: Adams's App., 113 Pa. 449; Evans v. Goodwin, 132 Pa. 136; Edgett v. Douglass, 144 Pa. 95; Fidelity Co. v. Weitzel, 152 Pa. 498; Drake v. Lacoe, 157 Pa. 17; Shillito v. Shillito, 160 Pa. 167; Searight v. Bank, 162 Pa. 504; Harrington Bros. v. Florence Oil Co., 178 Pa. 444;

Bank of Kentucky v. Schuylkill Bank, 1 Pars. 180; Wiser's App., 9 W. N. C. 508.

The court below committed error in reversing the master's findings of fact. The learned judge did not discuss, quote from, or refer to the testimony of a single witness, or to any evidence offered before the master. He gave no reason for the findings of fact made by him, or why he disagreed with the findings of fact by the master. His entire reference to the evidence and to the master's report was, " From an examination of the testimony I cannot agree with the learned master in his findings of fact and conclusions of law." It was precisely the method of disposing of a master's findings criticised, and for which the decree was reversed, in Morgan's App., 125 Pa. 561, and Scheppers's App., 125 Pa. 598.

An examination of the testimony will convince this Court of the correctness of the findings of the master in any event.

*Albert B. Osborne*, for appellees.—It is too late to raise the question of jurisdiction : Sunbury & Erie R. R. Co. v. Cooper, 33 Pa. 278; Adams's App., 113 Pa. 449; Fidelity Co. v. Weitzel, 152 Pa. 502; People's Nat. Bank of Pitts. v. Loeffert, 184 Pa. 164; Enright v. Amsden, 40 Atl. Rep. 37.

Equity has jurisdiction : Kisor's App., 62 Pa. 435; Kerr v. Trego, 47 Pa. 295; Winebrenner v. Colder, 43 Pa. 244; Schnorr's App., 67 Pa. 138.

It was the intent and purpose of Robert McCray in 1853 to dedicate this property to the Wesleyan Methodists : Carter v. Tinicum Fishing Co., 77 Pa. 315; Hasson v. Klee, 181 Pa. 117.

There is no such evidence on the part of defendants as will suffice to break down the continuous, adverse possession of complainants : O'Hara v. Richardson, 46 Pa. 390; Duren v. Sinclair, 22 S. Car. 361; Ewing v. Alcorn, 40 Pa. 500; Hughs v. Pickering, 14 Pa. 301; Hasson v. Klee, 181 Pa. 117; Susquehanna, etc., Coal Co. v. Quick, 61 Pa. 340; Miller v. Miller, 60 Pa. 16.

OPINION BY MR. JUSTICE DEAN, October 6, 1899 :

The plaintiffs filed the bill in this case, averring : 1. That in 1853, one Robert McCray donated to them land in Concord township whereon to build a Wesleyan Methodist church, which

church was built and dedicated by their denomination, and since has been in its sole occupancy and control.   2. That on or about April 16, 1893, the defendants took forcible possession of said church, and since that date have repeatedly done so, and loudly proclaim their purpose to continue so to do.   3. That none of defendants are members of the Wesleyan Methodist church, or have part in its government.   4. A prayer for a perpetual injunction excluding defendants from the church, and restraining them from in any way interfering with the plaintiff's exclusive control and occupation of the same.

Defendants answered, not denying plaintiffs' right to the use of the church, but averring: 1. That the church property is the common property of the Protestant Christian sects of the township; that it was built and repaired by money subscribed by all of them, on the agreement and understanding that all denominations, Wesleyans, Congregationalists, Methodists, Presbyterians and Episcopalians, should use it, without either interfering with the other.   2. That the gift of the land was made by the owner, with the condition that the church built thereon was not to be that of any particular denomination, but was to be used by all in harmony.   3. That since it was erected, it has been used without hindrance by the different denominations, down until April 16, 1893, when plaintiffs sought to exclude defendants from the use of the same, although such use in no manner interfered with plaintiffs' occupation, and that while they, defendants, insisted on their right, as contributors, to worship in the church, they used no violence, nor do they intend to do so.   4. That defendants have title to the land by a conveyance from the heirs of the original donor, Robert Mc-Cray.   5. That equity has no jurisdiction, because plaintiffs have an adequate remedy at law.

It will be noticed, except as to the denial of jurisdiction, the single question raised by the issue is one of fact.   Is the plaintiffs' right an exclusive one?

Manley Crosby, Esq., was appointed master, to take testimony, find facts and law, and suggest decree.   He held many hearings; a very large number of witnesses were sworn, whose testimony is embodied in 437 pages of printed testimony now before us.   He finds, in substance, that at the time the church was built, in 1853, the neighborhood was far more thinly pop-

ulated than in 1893, forty years afterwards; that there was no
church building within several miles; that worship was had in
school houses and private dwellings; that no one sect had the
financial strength to build and maintain a church; under these
circumstances the members of all denominations agreed to unite
their contributions and appropriate the common fund to the
erection of the building, which was to be used by all the sects,
not to the interference, however, with each other; that the
Wesleyans, being the most numerous, their contributions were,
in the aggregate, the largest, therefore, they, by consent, were
to have the preference in the use, and the others were to defer
to them in the occupation. On this understanding, all paid
their money; the church was built, occupied and maintained
by all, without friction, until 1890; it then needed very exten-
sive repairs; at a public meeting of all interested the questions
of the cost of repairs as well as the rights of contributors were
discussed, and it was unanimously agreed that the use of the
church should continue as theretofore; the Wesleyans to have
the control and preference, but the other denominations to have
the right of occupation at such times as it was not in use for
public worship by the Wesleyans.

On the facts found, the master concludes that plaintiffs have
the right to control and manage the property, and in good faith
use the same for religious worship; that defendants, when the
church is not so in use by plaintiffs, have the right to use and
occupy it for public worship, without interference by plaintiffs.
He suggested a decree in accord with his conclusions, and so
reported to the court. Plaintiffs filed exceptions to nearly all
the master's findings of fact. On hearing, the learned judge of
the court below set aside the report of the master and awarded
a perpetual injunction, restraining defendants from going upon
the premises for purpose of hearing preaching or engaging in
other forms of worship, without consent of plaintiffs first had
and obtained; that is, he gave the exclusive use and occupation
of the property to the plaintiffs, notwithstanding the facts found
by the master.

If the findings of fact by the master are right, the decree of
the court is manifestly wrong; wrong, because defendants were
as much entitled to their qualified possession as plaintiffs to
theirs. If they had paid their money as a consideration for the

enjoyment of it for forty years, and uninterruptedly enjoyed it for that period, how can equity, to say nothing of the rule, "Do unto others as you would have others do unto you," now turn them out? The learned judge does not point out any particular wherein the evidence was insufficient to warrant the master's conclusions, nor does he allude to any evidence to sustain his own; he simply remarks: "From an examination of the testimony, I cannot agree with the learned master in his findings of fact and conclusions of law." The evidence, it is true, was to some extent contradictory, but the master had a far better opportunity than either of us for arriving at the truth; except as to three witnesses, whose depositions were taken, all were personally before him, and in his presence examined and cross-examined. To our minds the decided weight of the evidence established the fact of the original agreement to build the church, and that the contributions of the non-Wesleyans were made on the faith of it; it was proved, and in fact conceded by plaintiffs' witnesses, that for almost forty years all sects had used the house for public worship, without any exclusive claim being asserted by plaintiffs. It is alleged that such use was a mere license revocable at pleasure; but the use exactly accorded with the alleged original agreement, and was persistently claimed, not as a favor, but as a right by defendants. Notice particularly the testimony of Henry Parsons, a member and trustee of the Wesleyan church; he states that all denominations occupied it without request to or assent by the Wesleyans; that the Wesleyan trustees did not consider their consent necessary; that many non-Wesleyan ministers, during that time, occupied the pulpit, of whom he recollects and names five; that the Sunday school regularly conducted was composed of all denominations, and the superintendent elected by the votes of all. To the same effect is the testimony of many others, including that of a number of the ministers who preached from the pulpit. The acts of the other denominations, as well as the passiveness of these plaintiffs, during all these years, point, not to the enjoyment of a favor, but to the exercise of a conceded right. Then, as late as 1890, three years before the commencement of this suit, the building requiring expensive repairs, a meeting of members of the different denominations, including two of the Wesleyan trustees, was held in the churchyard, and it was

unanimously agreed that the repairs should be made by the contributions of all; that there should be no change in the manner of its use, but in the future, as in the past, it should be occupied by all denominations.   This was, at least, one of the inducements to contribute, and on the faith of it the repairs were made and paid for.

A most thorough perusal of all the testimony satisfies us that it amply sustains the findings of the master.   This labor ought not to have been imposed upon us.   The language of the court in Morgan's Appeal, 125 Pa. 561, ought to have prompted the learned judge of the court below to something more than a mere pro forma decree.   It was there said, on a similar record to this one: " To reverse a master's findings without assigning any reasons is simply an act of arbitrary power, and practically leaves the findings in full force. . . . Every such case is entitled to the careful consideration of the court of common pleas in which it is heard, and we should have the views of the learned judge upon the facts and the law."   Precisely the same ruling was made, for the same reasons, in Scheppers's Appeal, 125 Pa. 598, the only difference being that in the latter case the court, without reasons given, reversed the finding of fact by an auditor instead of by a master.   Therefore, on the merits, the appeal is sustained.

As to the question of jurisdiction, although formally pleaded in the answer, it was not pressed before the master or the court, and was not passed upon by them.   We doubt whether the remedy at law, if plaintiffs' averments had been sustained by the evidence, would have been an adequate one; but, however this may be, defendants chose not to press the plea to the jurisdiction until they reached this Court; in the mean time, a long and expensive hearing has been had; they took the chances of a favorable decree before the master and the court.   We will not, at this late day, dismiss the bill for want of jurisdiction, which at most is only doubtful: Fidelity Co. v. Weitzel, 152 Pa. 498; Drake v. Lacoe, 157 Pa. 17; Searight v. Bank, 162 Pa. 504.

But, as already indicated, on the merits, we reverse the decree of the court below, and adopt the findings of fact and conclusions of law reported by the master.   We approve the decree of the court fixing the master's fees.   We have no power,

there being no cross-bill, to enjoin plaintiffs, as suggested by the master; defendants have, affirmatively, made no complaint. Therefore, we simply reverse the decree, except as to that part fixing the master's fee, and direct that the bill be dismissed at the costs of appellees; there is no good reason for imposing any part of the costs on defendants, because, against their will, they were forced into litigation to maintain a clearly established right.