CHEMICAL FOUNDATION, Inc., v. E. I. DU PONT DE NEMOURS & CO. et al., and three other cases.

District Court, D. Delaware. November 16, 1928.

Nos. 487, 492, 494, 495.

William G. Mahaffy, of Wilmington, Del., Joseph H. Choate, Jr., and James Garretson, both of New York City, and Seiforde M. Stellwagen, of Washington, D. C., for plaintiff Chemical Foundation.

Charles F. Curley, of Wilmington, Del., and Bruce Bromley and Almuth C. Vandiver, both of New York City, for German plaintiffs.

John P. Laffey and W. S. Gregg, both of Wilmington, Del., for defendant E. I. Du Pont de Nemours & Co.

Leonard E. Wales, U. S. Dist. Atty., of Wilmington, Del., and Thomas E. Rhodes, Asst. Atty. Gen., for defendant Alien Property Custodian.

MORRIS, District Judge. The bill of complaint in each of these four suits consolidated for trial, was filed against E. I. Du Pont de Nemours & Co. and Frank White, as Treasurer of the United States, to recover from the corporate defendant under section 10(f) of the Trading with the Enemy Act, 40 Stat. 411 (50 USCA Appendix, § 10(f), a reasonable royalty for the use and enjoyment by it, under license made January 1, 1918, by the Federal Trade Commission, of United States letters patent Nos. 680,395, 718,340, and 868,294, then enemy-owned. The plaintiffs are the three German corporations severally owning the three patents at the time the license was made, and the Chemical Foundation, Incorporated, to which, after his seizure of the patents on February 3 and March 22, 1919, the Alien Property Custodian assigned the patents on April 10, 1919. The German plaintiffs expressly limit the relief sought by them to the "royalties" that accrued under the license prior to the date of the assignment of the patents to the Chemical Foundation, hereinafter called accrued royalties, while that plaintiff limits the relief sought by it to the "royalties" that accrued under the license subsequent to the date of its acquisition of the patents under the assignment. The license, granted "for the term of each of the respective patents, unless sooner terminated," was terminated by mutual consent September 1, 1920.

To these suits the Treasurer of the United States was made a party defendant, in obedience to statutory requirement. Section 10(f). The reason for this statutory mandate is found in section 10(d) of the act, which calls for the payment by the licensee to the Alien Property Custodian of certain sums to be fixed by the license, and the deposit thereof forthwith by that officer "in the Treasury of the United States as a trust fund for the said licensee and for the owner of the said patent, * * * to be paid from the Treasury upon order of the court, as provided in subdivision (f) of this section, or upon the direction of the Alien Property Custodian."

The cases were tried upon stipulated facts, under which the corporate defendant does not dispute the right of the Chemical Foundation to recover from it a reasonable royalty, but it asserts that, as section 10(c) of the Trading with the Enemy Act, under which the license was granted, provides: "Such license shall be a complete defense to any suit at law or in equity instituted by the enemy or ally of enemy owners of the letters patent, * * * or otherwise, against the licensee for infringement or for damages, royalty, or other money award on account of anything done by the licensee under such license, except as provided in subsection (f) hereof," its liability for its use and enjoyment of the patents is solely that created by the terms of section 10(f) of the Trading with the Enemy Act, that the limitations specified in the statute creating the liability are a part of the right of action itself, that compliance therewith is essential to the successful assertion of the right conferred by the statute, and that because of the seizure and sale of the patents by the Alien Property Custodian the German plaintiffs were not at the time the suits were brought in 1922, and have not at any time since been, the owners of the patents within the meaning of subsection (f). In support of their claims the German plaintiffs rely mainly upon an amendment made to that subsection by section 19 of the Settlement of War Claims Act of 1928, approved March 10, 1928.

Section 10(f), as originally passed, provides:

"The owner of any patent, * * * under which a license is granted hereunder may, after the end of the war and until the expiration of one year thereafter, file a bill in equity against the licensee in the District Court of the United States for the district in which the said licensee resides, or, if a corporation, in which it has its principal place of business (to which suit the Treasurer of the United States shall be made a party), for recovery from the said licensee for all use and enjoyment of the said patented invention, * * * Provided, however, That whenever suit is brought, as above, notice shall be filed with the Alien Property Custodian within thirty days after date of entry of suit: Provided further, That the licensee may make any and all defenses which would be available were no license granted. The court on due proceedings had may adjudge and decree to the said owner payment of a reasonable royalty. The amount of said judgment and decree, when final, shall be paid on order of the court to the owner of the patent from the fund deposited by the licensee, so far as such deposit will satisfy said judgment and decree; and the said payment shall be in full or partial satisfaction of said judgment and decree, as the facts may appear; and if, after payment of all such judgments and decrees, there shall remain any balance of said deposit, such balance shall be repaid to the licensee on order of the alien property custodian. If no suit is brought within one year after the end of the war, or no notice is filed as above required, then the licensee shall not be liable to make any further deposits, and all funds deposited by him shall be repaid to him on order of the Alien Property Custodian. * * * "

Section 19 of the Settlement of War Claims Act of 1928 reads thus:

"Subsection (f) of section 10 of the Trading with the Enemy Act, as amended, is amended by adding at the end thereof the following new paragraph:

"'In the case of any such patent, * * *, conveyed, assigned, transferred, or delivered to the Alien Property Custodian or seized by him, any suit brought under this subsection, within the time limited therein, shall be considered as having been brought by the owner within the meaning of this subsection, in so far as such suit relates to royalties for the period prior to the sale by the Alien Property Custodian of such patent, * * *, if brought either by the Alien Property Custodian or by the person who was the owner thereof immediately prior to the date such patent, * * *, was seized or otherwise acquired by the Alien Property Custodian.'"

Each of the bills of complaint was filed in 1922, within one year after the end of the war. Notice of each suit was filed with the Alien Property Custodian within 30 days after the entry of suit. The sole primary issue, as I understand it, is whether the German plaintiffs have established that they are the respective "owners" of the several patents, within the meaning of section 10(f), either as originally passed or as amended. ▮ That the German plaintiffs were the respective owners of the several patents at the time the license was granted, and that they continued to be the owners thereof until the seizure of the patents by the Alien Property Custodian, is not disputed. That the seizure of the patents by the Alien Property Custodian divested the enemy owners of their property in and to the patents, and vested the Alien Property Custodian therewith as fully and completely as if the seizure had been a valid assignment by the enemy owners, is now settled. United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131; Commercial Trust Co. v. Miller, 262 U. S. 51, 56, 43 S. Ct. 486, 67 L. Ed. 858; Hicks v. Anchor Packing Co., 16 F.(2d) 723 (C. C. A. 3); Hunyadi Janos Corporation v. Stoeger (D. C.) 5 F.(2d) 506, 508. Yet, as an assignment of a patent, without more, does not transfer to the assignee the right to recover damages or profits for prior infringements (Moore v. Marsh, 7 Wall. 515, 522, 19 L. Ed. 37; United States v. Loughrey, 172 U. S. 206, 211, 212, 19 S. Ct. 153, 43 L. Ed. 420; Canda Bros. v. Michigan Malleable Iron Co. (C. C. A.) 152 F. 178, 180), although royalties to accrue and damages and profits for future infringements are incident to and accompany the patent unless separated by express reservation (Canda Bros. v. Michigan Malleable Iron Co., supra; May v. Saginaw Co. (C. C.) 32 F. 629, 632), and as a patentee may after assigning the patents sue and recover for past infringements (Moore v. Marsh, 7 Wall. 515, 19 L. Ed. 37), it would seem obvious that an assignor of a patent would have like rights with respect to royalties accrued at the time of the assignment. But the right to recover accrued royalties or damages and profits for past infringements may likewise be assigned. Merriam v. Smith (C. C.) 11 F. 588, 589; Consolidated Oil Well Pack-

er Co. v. Eaton, etc., Co. (C. C.) 12 F. 865, 870; Adams v. Bellaire Stamping Co. (C. C.) 25 F. 270; Walker on Patents, § 395.

The question thus arises whether, at the time of the seizure of the patents or at any other time, the Alien Property Custodian was empowered to and did seize the "royalties" accrued under the license of these enemy-owned patents, for, if there has been no seizure of the accrued royalties, the owners of the patents at the time the royalties became due are, with respect to such royalties, the "owners" of the patents, within the meaning of section 10(f), notwithstanding their title to the patents was divested by seizure, unless, by limiting to "the owner of the patent" the right to sue, Congress intended to create a new rule with respect to royalties and damages accruing under the enemy-owned patents prior to assignment, and to provide that such royalties and damages should pass with and as an inseparable incident of the patent assigned. It is unnecessary, however, here to decide whether accrued royalties did or did not pass with the patent as an inseparable incident, for the accrued royalties, as well as the patents, were expressly seized by the Alien Property Custodian.

██ That the Alien Property Custodian was empowered by Congress to seize accrued royalties, as well as patents, is made manifest by section 7(c) of the Trading with the Enemy Act, as amended November 4, 1918, 40 Stat. 1020 (50 USCA Appendix, § 7(c), which says:

"If the President shall so require any money or other property including (but not thereby limiting the generality of the above) patents, * * * choses in action, and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or the same may be seized by the Alien Property Custodian; and all property thus acquired shall be held, administered and disposed of as elsewhere provided in this act."

All conditions precedent having been complied with, the Alien Property Custodian, in the exercise of the power so conferred, on February 3, 1919, did in fact seize patent No. 718,340, not only, but as

well "every right, title and interest with respect thereto, including all damages and profits recoverable at law or in equity from any person, firm, corporation or government, for past infringement thereof." On March 22, 1919, the Alien Property Custodian likewise seized the two remaining patents "and every right, title and interest with respect thereto, including all damages and profits recoverable at law or in equity from any person, firm, corporation or government, for past infringement thereof, subject to the rights of E. I. Du Pont de Nemours & Co., Wilmington, Delaware." The express recognition in two of the instruments of seizure of the outstanding license had, of course, no more effect upon the right to royalties accrued and to accrue than a sale of land subject to an outstanding lease has upon the right to rent accrued and to accrue. United States v. Loughrey, 172 U. S. 206, 211, 212, 19 S. Ct. 153, 43 L. Ed. 420; 16 R. C. L. 915.

██ That the comprehensive language of the instruments of seizure embraced accrued royalties cannot, I think, in view of the purpose and scope of the amendment of November 4, 1918, be open to doubt. The so-called "royalties" here sought to be recovered are in truth but the statutory, 10 (f), damages fixed in terms of royalty for defendant's infringement of the patents. The German plaintiffs were the owners of the patents at the time the license was granted to the defendant by the Federal Trade Commission. A true license can be granted only by one who owns or has an interest in the property affected by the license. Ruffin v. Seaboard Air Line R. Co., 151 N. C. 330, 66 S. E. 317; Williams v. Concord Cong. Church, 193 Pa. 120, 44 A. 272; Bohn v. Hatch, 133 N. Y. 64, 30 N. E. 659. That which in legal contemplation Congress, in the exercise of its war powers, really did under sections 10(c) and 10(f) of the Trading with the Enemy Act, was, I think, not to provide for the granting of true licenses, but to change in favor of one infringing under the supervision of the Federal Trade Commission the measure of damages ordinarily prevailing in infringement suits, and to grant to one so infringing immunity from suit until after the end of the war.

██ The Alien Property Custodian having been empowered to seize the German plaintiffs' right to accrued royalties, and having exercised that right, the Alien Property Custodian became the owner thereof. Hicks v. Anchor Packing Co., 16 F.(2d) 723 (C. C. A. 3). Thereafter, on April 10, 1919,

602

the Alien Property Custodian, acting under authority of the Trading with the Enemy Act as amended, and of the order of Frank L. Polk of February 26, 1919, to whom the President had delegated his authority in the premises, authorizing the Alien Property Custodian to sell at private sale to the Chemical Foundation, Inc., "all the letters patent, * * * including all profits and demands recoverable at law or in equity for the past infringement thereof, which the Alien Property Custodian may have seized or might seize, * * *" sold and assigned to the Chemical Foundation, Inc., the whole right, title, and interest acquired by him, the Alien Property Custodian, under the instruments of seizure, including the right to the choses in action for "all claims and demands for profits and damages recoverable at law or in equity for the past infringement of said letters patent." Later, on February 13, 1920, the President, by executive order, reciting that doubt had arisen with respect to the authority of the Alien Property Custodian to sell and convey to the Chemical Foundation, Inc., "certain of the said choses in action, rights, interests, benefits under agreements, and rights and claims, including rights to receive moneys by way of royalties or otherwise, as compensation for the use of patents, trade-marks or trade-names," authorized the Alien Property Custodian to ratify and confirm the sales made to the Chemical Foundation, Inc., by the execution and delivery of a suitable instrument of ratification.

Acting in accordance with this order, the Alien Property Custodian on March 1, 1921, executed an assignment to the Chemical Foundation, Inc., confirming and ratifying the sale and assignment, and selling and assigning to the Chemical Foundation, Inc., "all choses in action, rights, interests, and benefits under agreements and rights and claims of every character and description growing out of and appurtenant to the ownership of said property, including (but not thereby limiting the generality of the foregoing) rights to receive moneys by way of royalties or otherwise as compensation for the use of patents * * * and all right, title, and interest in and to the choses in action and the funds referred to in section 10, subsection (f), of the 'Trading with the Enemy Act,' as amended, acquired by the Alien Property Custodian by virtue of the seizures by which there were seized patents, * * * under which a license had theretofore been granted in accordance with the provisions of section 10, subsection (c), of

said act, as amended, * * * the intent and purpose of this instrument being to vest in said the Chemical Foundation (Inc.) every right, title, interest, claim, and demand, save such as are specifically excepted in and by the said assignments, acquired by the Alien Property Custodian by virtue of the seizures whereby the said property was seized." These orders and-assignments were sustained in United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131.

By virtue of the statute, these orders and assignments the Chemical Foundation became the owner of the choses in action, or right to recover from the defendant the accrued royalties, originally belonging to the German plaintiffs. It is true that the Chemical Foundation has elected not to exercise its right to recover the accrued royalties from the defendant. But such election does not operate as an assignment of that right, either to the German plaintiffs or to the Alien Property Custodian. Consequently the German plaintiffs are without cause of action, and without right to recover from the defendant the accrued royalties, unless by the amendment of March 10, 1928, to section 10(f) of the Trading with the Enemy Act, Congress divested the Chemical Foundation of its right and revested the Germans therewith.

That right is a chose in action. A chose in action is property. The Fifth Amendment to the Constitution of the United States, providing that no person shall be deprived of his property without due process of law, denies to the Congress power to transfer property from one to another, directly or indirectly. Ochoa v. Hernandez, 230 U. S. 139, 33 S. Ct. 1033, 57 L. Ed. 1427; Gilman v. Tucker, 128 N. Y. 190, 28 N. E. 1040, 13 L. R. A. 304, 26 Am. St. Rep. 464. In the former of these cases the Supreme Court, holding that, even if the commanding officer in territory occupied by military forces of the United States has all the legislative power as to such territory possessed by Congress, he is still subject, as Congress is, to the provisions of the Fifth Amendment, and cannot by military orders deprive persons of their property without due process of law, said (page 161 of 230 U. S. [33 S. Ct. 1041]):

"Whatever else may be uncertain about the definition of the term 'due process of law,' all authorities agree that it inhibits the taking of one man's property and giving it to another, contrary to settled usages and modes of procedure, and without notice or an opportunity for a hearing."

■ The German plaintiffs, correctly asserting that the war powers of Congress are not limited or affected by the restrictions of the Fifth and Sixth Amendments (Miller v. United States, 11 Wall. 268, 304, 305, 20 L. Ed. 135), take the position that the amendment of 1928 to section 10(f) of the Trading with the Enemy Act was an exercise by Congress of its constitutional power to "make rules concerning captures on land and water." Constitution, art. I, § 8. The Treaty of Peace with Germany was signed in Berlin August 25, 1921. The President's proclamation on November 14, 1921, declared the war "terminated on July 2, 1921." If, however, the Treaty of Peace did not constitute a bar to subsequent action by Congress concerning captures on land and water, and the amendment of 1928 was in truth an exercise of its war powers, that fact constitutes a denial that the amendment was intended to operate upon or with respect to the choses in action here involved, for that property having been on April 10, 1919, sold and passed into the channels of commerce under the express authority of Congress (section 12 of the Trading with the Enemy Act, as amended March 28, 1918, 40 Stat. 460; United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131), the war powers of Congress with respect to that property became, thereupon, functus officio.

■ After its sale the government did not hold it, and it no longer bore the stamp "Captured Property." Captured property sold under authority of Congress to American citizens passed from under the powers of Congress touching captured property as fully and completely as a patented article sold by the patentee passes from under the monopoly of the patent. See Chaffee v. Boston Belting Co., 22 How. 217, 223, 16 L. Ed. 240. The property to which the Congress reserved the right to make disposition after the war did not include that sold under its authority during the war. The amendment of 1928 is wholly without effect upon United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131, and Hicks v. Anchor Packing Co., 16 F.(2d) 723 (C. C. A. 3). What the effect of that amendment may be in instances in which the seized choses in action have never been disposed of, and are still retained by the Alien Property Custodian, it is neither necessary nor proper here to decide. Having no cause of action, either at the time their suits were entered or at any time since, the bills of complaint filed by the German plaintiffs must be dismissed.

■ The Alien Property Custodian, however, asserting that by the seizures he became the owner of the patents and of the right to recover the accrued royalties, and that the right to recover the accrued royalties has not been disposed of and is now owned by him, now moves that he be substituted for the German plaintiffs in the three suits brought by them. That the Custodian is correct in his assumption that the full right and title to the choses in action for the accrued royalties were, through seizure, acquired by him, has been hereinbefore shown. His second contention—that he was without power to sell the accrued royalties— rests, as I understand it, upon the fourfold proposition that the accrued royalties consisted of the moneys deposited, after payment by the licensee, by him in the Treasury of the United States, pursuant to section 10(d); that he was without power to sell money; that Congress, by providing in section 12 of the Trading with the Enemy Act, "After the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the Alien Property Custodian on deposit in the United States Treasury, shall be settled as Congress shall direct," 40 Stat. 411, reserved to itself the right to make disposition of these moneys after the end of the war; and that Congress by the Settlement of War Claims Act of 1928 has exercised this reserved power.

I think these propositions cannot be sustained. The bills of complaint were filed, not against the funds in the hands of the Treasurer under section 10(d), but for the recovery from the defendant of "a reasonable royalty" under section 10(f) for defendant's use and enjoyment of the inventions. The moneys paid by the defendant to the Alien Property Custodian, and by him deposited in the Treasury of the United States under section 10(d), are in no sense royalties or damages for infringement. They are merely a surety fund to which the plaintiff in a decree for the recovery for defendant's use and enjoyment of the invention may resort for full or partial satisfaction of the decree, as the facts may appear. There was, of course, no sale to the Chemical Foundation of these moneys by the Alien Property Custodian. That which was sold and assigned by him to the Chemical Foundation consisted of choses in action against the licensee. As those choses in action were assignable, the statute, section 10(f), conferred, as an incident to the assignment, upon the assignee reducing them to judgment or decree a right to resort to

604

. the surety fund for full or partial satisfaction of the decree. Again, the moneys paid by the defendant into the Treasury of the United States having been received by the Treasurer under section 10(d) "as a trust fund for the said licensee and for the owner of the said patent," it cannot be assumed that the Congress, by its amendment of 1928 to section 10(f) of the Trading with the Enemy Act, intended to violate the terms of the trust under which the moneys were held or to appropriate to the government's own use funds held by it in trust. Furthermore, Congress did not, by section 12 of the Trading with the Enemy Act, reserve to itself the right to make disposition of these moneys after the end of the war. On the contrary, by the provisos in the final paragraph of that section it expressly excepted these moneys from that reserved power.

The Alien Property Custodian, like the German plaintiffs, being without a cause of action at the time the suits were instituted, or at any time since, his motion must be denied, without regard to whether he would or would not be entitled to be substituted as a party plaintiff, had he a cause of action.

The Treasurer of the United States has moved that the bill of complaint filed by the Chemical Foundation be dismissed, upon the ground that it sets forth no cause of action. Since, however, that plaintiff became the purchaser and assignee of the patents, with which the right to future royalties and to damages for future infringements passed as an incident, and as it appears that the defendant used the inventions of the patents after the assignment, this motion must also be denied.

Decrees and orders in conformity herewith may be presented.