**FARBWERKE vormals MEISTER LUCIUS & BRUNING et al. v. CHEMICAL FOUNDATION, Inc., et al., and seven other cases.**

Nos. 4094–4101.

Circuit Court of Appeals, Third Circuit.

March 4, 1930.

Charles F. Curley, of Wilmington, Del., O'Gorman, Battle, Vandiver & Levy and Cravath, De Gersdorff, Swaine & Wood, all of New York City (Frederick H. Wood, Bruce Bromley, and Almuth C. Vandiver, all of New York City, of counsel), for the German Companies.

Leonard E. Wales, U. S. Atty., of Wilmington, Del., and Thomas E. Rhodes and P. H. Marcum, Sp. Assts. Atty. Gen., and Marion Henderson, Gen. Counsel Alien Property Custodian, for appellants Sutherland and another.

G. Carroll Todd, of Washington, D. C. (J. P. Laffey and W. S. Gregg, both of Wilmington, Del., of counsel), for appellee E. I. duPont deNemours & Co.

William G. Mahaffy, of Wilmington, Del. (Seiforde M. Stellwagen, of Washington, D. C., and James Garretson and Joseph H. Choate, Jr., both of New York City, of counsel), for Chemical Foundation, Inc.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge.

The Trading with the Enemy Act (approved October 6, 1917, 40 Stat. 411, c. 106 [50 USCA Appendix]), provided by section 10 (50 USCA Appendix, § 10) that the President be authorized to grant licenses under enemy owned patents to citizens of the United States desiring to practice their inventions when in his opinion such grants would be for the public welfare and tend to the successful prosecution of the war, being authorized within limitations to prescribe the fees, compensation or royalties for the privilege. Although by the provision of the Act for the recovery of royalties, to which we shall presently advert and on which these suits are founded, the Congress may at first have had in mind a remedy mainly to enemy owners of patents, particularly in view of the situation at the beginning when the Custodian was "a mere conservator" of seized enemy property without right to sell it except to prevent waste, United States v. Chemical Foundation, Inc., 272 U. S. 1, 10, 47 S. Ct. 1, 71 L. Ed. 131, 141, and when the beneficial interest remained in the enemy owner, yet the Congress by amendments made to the Act from time to time as the war progressed, so enlarged the general scope of the Act that it materially changed its character, Hicks v. Anchor Packing Co. (C. C. A.) 16 F.(2d) 723; United States v. Chemical Foundation, Inc., supra, and at the same time

changed, or made certain, the character of the provision in question without changing its wording or, until 1928, without adding any words to it. We shall therefore look upon the provision as it grew through the war and stood in 1922 when these suits were brought. Not knowing what changes in the title to enemy owned patents on which licenses should be granted might occur during the war, yet realizing that some such patents would retain undisturbed the same status of ownership throughout the war, that other enemy owned patents with outstanding licenses might descend through testacy or intestacy from the original owner, or be sold by him, during the war, and that, perhaps, still others might be seized by the Alien Property Custodian, and, as afterward happened, be by him either held or sold during the war, the Congress, looking to the future, provided by subsection (f) of section 10 (50 USCA Appendix § 10(f) what the owner of such a patent might do after the end of the war and provided broadly enough to meet these and perhaps other situations as follows:

"The *owner* of any patent * * * under which a license is granted hereunder may, after the end of the war and until the expiration of one year thereafter, file a bill in equity against the licensee in the district court of the United States * * * (to which suit the Treasurer of the United States shall be made a party), for recovery from the said licensee for all use and enjoyment of the said patented invention."

Pursuant to this provision, Chemical Foundation, Inc., on June 23, 1922—within one year after the end of the war—filed a bill in equity in the District Court against E. I. duPont deNemours & Company (a corporate licensee) and Frank White, Treasurer of the United States, averring that United States Letters Patent Nos. 680,395, 868,294 and 718,340 had been granted the German inventors therein named; that, in January 1918, the Federal Trade Commission, acting for the President under authority of the cited section of the Act, granted a license to E. I. duPont deNemours & Company under these letters patent requiring it to pay the Alien Property Custodian certain royalties reckoned first on profits derived and later on gross amounts received from the sale of products under the license; that subsequently to granting the license the Custodian (on February 3 and March 22, 1919) seized the patents and every right, title and interest with respect to them, which included the right to royalties under the license; that on April 10,

1919 the Custodian sold to the plaintiff, the Chemical Foundation, these letters patent and every right, title and interest he had in them, which included the royalties so acquired; that on September 1, 1920, the license was cancelled and surrendered; that, by reason of the aforegoing, the Chemical Foundation became the "owner" of said letters patent and of the royalties accrued to April 10, 1919, the date on which the Custodian sold it the patents with the accompanying license rights, and also the royalties which accrued thereafter; praying (after it had elected not to exercise its right to recover royalties that had accrued prior to the latter date) that an accounting be taken by the court, after fixing a reasonable royalty, to ascertain the amount due it by the defendant licensee after the date last named and also the amounts which the defendant had paid the Alien Property Custodian on account of the license and which he had deposited with the defendant Frank White, as Treasurer of the United States, and, finally, praying for an order upon the Treasurer of the United States to pay it all or so much of the license money so deposited with him as will cover the royalties, and, if insufficient, that it have judgment or decree against the defendant licensee for the residue.

Almost immediately on filing its bill, the Chemical Foundation, plaintiff in the above stated action, became the active or potential defendant, though not the nominal defendant, in sundry other actions and cross proceedings. Three German corporations, severally owning the three patents named in the first suit at the time the license was issued, filed on June 30, 1922, bills in equity in the same District Court against the duPont Company, the same licensee, and the Treasurer of the United States, relying mainly on section 10 (f) of the Trading with the Enemy Act as amended by section 19 of the "Settlement of War Claims Act of 1928," approved March 10, 1928, which provided by a new paragraph to section 10 (f), 50 USCA Appendix § 10 (f), that:

"In the case of any such patent * * * conveyed, assigned, transferred, or delivered to the Alien Property Custodian or seized by him, any suit brought under this subsection, within the time limited therein, shall be considered as having been brought by the *owner* within the meaning of this subsection, in so far as such suit relates to royalties for the period prior to the sale by the Alien Property Custodian of such patent, * * * if brought either by the Alien Property Cus-

todian or by the person who was the owner thereof immediately prior to the date such patent, * * * was seized or otherwise acquired by the Alien Property Custodian. * * * "

Each German plaintiff claimed in its bill to be such "owner" and averred, mutatis mutandis, substantially the same facts as the Foundation averred in its bill and prayed for substantially the same relief (limited, however, to royalties that had accrued prior to April 10, 1919, the date the patents were sold by the Custodian to the Foundation), first against the moneys which the defendant licensee had through the Custodian deposited with the Treasurer of the United States and, if insufficient, then a judgment or decree against the defendant licensee for the residue.

In addition to the contesting claims of ownership of the royalties under the license, made by the Chemical Foundation on the one hand and the group of German corporations on the other, the Alien Property Custodian appeared on April 28, 1928—six years after suit—and moved that he be substituted as plaintiff in each of the actions instituted by the German corporations, on the contention that, under section 10 (f) of the Trading with the Enemy Act as amended, he is the "owner" of the royalties on the theory that he lawfully acquired them through seizure (by a predecessor in office) from the original German owners; that, though his predecessor sold them with the patents to the Foundation, he was without power to sell them; that, in consequence, they are still his; that he alone is entitled to recover them from the defendant licensee; and that his recovery should be for the use and enjoyment of the patented inventions for the entire time that company used them under the license of the Federal Trade Commission.

And, finally, the Treasurer of the United States moved to dismiss all four bills on the ground that they set forth no cause of action. Abandoning his motion to dismiss the bills filed by the three German corporations, he, however, held to his motion to dismiss the bill filed by the Foundation.

The duPont Company, the defendant licensee, filed an answer in each suit and made a motion to dismiss in each of the three suits of the German corporations.

The cases were consolidated and tried upon stipulated facts. The defendant licensee did not dispute the right of the Foundation to recover from it a reasonable royalty but as to all else availed itself of the defense

which section 10 (c) of the Act (50 USCA Appendix § 10 (c) afforded such a licensee. Of this we shall speak later.

The learned trial court by several appropriate decrees denied the motion of the Treasurer of the United States to dismiss, denied also the motion of the Alien Property Custodian to be substituted as plaintiff in the suits by the German corporations, held that the German plaintiffs are not "owners" of the accrued royalties and therefore not entitled to recover them, and, finally, that the Chemical Foundation is the owner of the royalties, accrued and accruing, and, having elected not to press its claim for royalties accrued, is entitled to an accounting by the defendant licensee for reasonable compensation or royalties for the use and enjoyment of the inventions under the letters patent for the period after April 10, 1919, which, when so determined, shall be paid the Foundation by the Treasurer of the United States from the fund made up of payments by the defendant licensee, pursuant to the terms of the license, and deposited with him by the Custodian, and, if insufficient, it should have a decree against the defendant for the residue. All parties, except the Chemical Foundation and the duPont Company, appealed.

Thus it happens there are three claimants to the royalties paid the Treasurer under the license of the patents in question—the group of German corporate plaintiffs, the Alien Property Custodian and the Chemical Foundation. Their claims are in each instance based on ownership of the royalties. Who owned them? The answer to that question decides the case. But before that question can be answered we must determine who owned the patents, under which the license was granted, at the time the four suits were brought and the Custodian endeavored to intervene, for it is only to "the owner of any patent * * * under which a license is granted" that section 10 (f) of the Trading with the Enemy Act (50 USCA Appendix § 10(f) accords the right to "file a bill in equity against the licensee * * * for recovery [of fees, compensation or royalties] * * * for all use and enjoyment of the said patented invention."

Were the German plaintiffs owners of the royalties at the time of suit? They were, without question, owners of the patents at the time the Federal Trade Commission issued the license under them to the defendant. They were, however, at that time enemy owners and it was because of that characteriza-

tion and of the exigencies of war as well, that the use and enjoyment of the patented inventions were taken from them and, in the interest of the public welfare and the successful prosecution of the war, turned over to the defendant through the medium of a license. Though called a "license" for want of a better term, the legal minds in Congress recognized that it was not a true license, for a license in the legal sense can be granted only by the owner of a patent, Ruffin v. Seaboard Air Line R. Co., 151 N. C. 330, 66 S. E. 317; Williams v. Concord Cong. Church, 193 Pa. 120, 44 A. 272, and, in consequence, the royalties were not true royalties. The transaction was in essence more nearly a qualified confiscation. So the Congress, though using the word "license," hesitated in using the word "royalty" as the consideration for what was not really a license but used also the words "fee," "damages," "other money." Moreover, instead of leaving an aggrieved owner of a patent to his normal remedy of suit for royalties, the Congress, realizing that the use even of an enemy owned patent without a true license from the owner would subject the user to suit for infringement, shut off the enemy patent owner from such an action and protected the patent user—called "licensee"—by providing that:

"Such license shall be a complete defense to any suit at law or in equity instituted by the enemy or ally of enemy owners of the letters patent * * * against the licensee for infringement or for damages, royalty, or other money award on account of anything done by the licensee under such license, except as provided in subsection (f) hereof." Section 10, subsection (c) (50 USCA Appendix § 10(c).

It is on this defense that the defendant licensee relies.

■■ When the Federal Trade Commission thus deprived the German patent owners of the use and enjoyment of their patented inventions, the Germans still remained owners of the patents in the sense of owning the title thereto. But on February 2 and March 22, 1919, the Alien Property Custodian under authority of the Trading with the Enemy Act, as amended, seized the patents. United States v. Chemical Foundation, Inc., 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131. That was long before these suits. Upon seizure of this enemy property the title of the enemy owners passed out of them. United States v. Chemical Foundation, Inc., supra; Hicks v. Anchor Packing Co. (C. C. A.) 16 F.(2d) 723, and it is not now claimed that title to

the patents ever went back into them. But the German plaintiffs do claim that when the ownership of the patents passed from them by seizure, ownership of the royalties under the license remained in them because the royalties were never seized, or, if seized, ownership is in them for a reason presently to be discussed.

Section 7 (c) as amended (50 USCA Appendix, p. 210) authorized the Alien Property Custodian to seize among other things "patents, * * * choses in action, and rights and claims of every character and description owning or belonging to * * * an enemy. * * *" Under authority of that provision of the War Act, the Custodian, by formal instrument addressed to proper parties, when he seized the named patents also seized "every right, title and interest with respect thereto, including all damages and profits recoverable at law or in equity from any person, firm, corporation, or government, for past infringement thereof, subject to the rights of" the defendant licensee.

■ That the seizure—symbolic in character —completely divested the German owners of their title to the patents is now decided. United States v. Chemical Foundation, Inc., 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131; Commercial Trust Co. v. Miller, 262 U. S. 51, 56, 43 S. Ct. 486, 67 L. Ed. 858; Hicks v. Anchor Packing Co. (C. C. A.) 16 F.(2d) 723. Whether the seizure included the royalties incident to the patents and deprived the German owners of the right later to recover them under section 10 (f) of the Act (50 USCA Appendix, § 10(f) as though they had never been seized, depends upon whether the words employed in the act of seizure were broad enough to embrace them. It would seem on their face that the words "every right, title and interest with respect to" the patents would include royalties. Royalties are a very real "interest" in, or in respect to, a patent and the right to recover royalties is a very real "right." And they do include royalties unless there be substance in the German plaintiffs' contention that under well settled law "An assignment of a patent and of right, title and interest thereto does not (without more) transfer to the assignee the right to recover damages or profits for past infringement, Herman v. Detroit Shipbuilding Co. [D. C.] 295 F. 423, 425; Moore v. Marsh, 7 Wall. 515, 522 [19 L. Ed. 37]; United States v. Loughrey, 172 U. S. 206, 211, 212 [19 S. Ct. 153, 43 L. Ed. 420]; Canda Bros. v. Michigan Malleable Iron Co. [C. C. A.] 152 F. 178, 180, * * * and, a fortiori, it (such a general assign-

ment) would not confer the right to recover past royalties which would remain in the assignor." Accepting this law in the abstract, it is pertinent to note that we are not here concerned with an *assignment* of a patent or of royalties by the German owners to the Alien Property Custodian. We are concerned with their *capture*—an act of war. We are not dealing with an assignment of patents where there is a question of what was in the minds of the contracting parties as to royalties and as to what passed and what was retained under the terms of an instrument they had drawn and signed. We are dealing with an act of seizure and have to determine wholly outside the law of assignments whether by the terms of the symbol of seizure the royalties in question were included. Having in mind the purpose of the law and observing that the Custodian manifestly attempted to seize the German patents and everything "in respect" to them and to their ownership, we are of opinion that he accomplished what he attempted by words that embrace the royalties in question, and that, in consequence, the German plaintiffs were owners of neither the patents nor the royalties at the time they instituted their suits—unless the quoted amendment to section 10 (f) of the Trading with the Enemy Act made by the Settlement of War Claims Act of 1928 (which leaves the remedy for royalties as originally provided to "The owner of any patent" at time of suit, whoever he may be), ruthlessly divested the party who acquired ownership by capture, or the party who later acquired ownership by purchase from the captor, of his ownership in the royalties and revested it in the original owners.

██ The right to the accrued royalties, in whomsoever vested, is a chose in action; a chose in action is property; and an act which takes property from one person and gives it to another without legal procedure to determine their rights and without compensation is a deprivation of property without due process of law and is violative of the Fifth Amendment to the Constitution. Subscribing to the reasoning of the learned trial judge, we hold that the Amendment of 1928, valid and useful perhaps in many situations, did not restore to the German plaintiffs ownership of either the patents or the royalties. It follows they did not own the royalties when they filed their bills—the critical time under the statute supplying the remedy—and that, in consequence, the decrees dismissing their suits must be affirmed.

Was the Alien Property Custodian owner of the royalties, or of the right to recover them, at the time of the Germans' suits in 1922 or in 1928 when he sought to be substituted for the German plaintiffs?

Disposing of the last question first, it appears to us that whatever the meaning or intent of the amendment to section 10 (f), 50 USCA Appendix § 10(f) on which the Custodian relies for his right to recover royalties, whether to restore to the Germans a claim for the use and enjoyment of their patented inventions or otherwise, it, by definite expression, relates only to "royalties for the period *prior* to the sale by the Alien Property Custodian of such patents" which the Foundation is not now seeking to recover. Moreover, the amendment leaves the main body of section 10 (f), as first drawn, untouched and therefore leaves it with its limitation that, to recover royalties, the "owner" of the patent must file his bill within one year after the end of the war. The Custodian, if owner, has never filed such a bill. Therefore the statute has run against him. Doubtless realizing this, he asked the trial court that he be substituted for the German plaintiffs who filed their bills within the time the statute prescribed. This, seemingly, was an attempt on the part of the Custodian to get under the fallen bar of the statute of limitations and avail himself of the diligence of the German plaintiffs and, oddly enough, to deprive them of their right, seasonably asserted, to litigate their claims against the defendant licensee. This, without more, is enough to sustain the trial court's refusal to substitute the Custodian for the German plaintiffs. But as the Custodian's ownership of the patents and royalties, past or present, is a step in the orderly devolution of ownership or title to the patents and royalties in question, we shall, for purposes of discussion, regard the Custodian as properly in court and inquire whether or not he owned the patents and royalties at the date of the Germans' suit.

Whereas the German plaintiffs contend that when the Alien Property Custodian seized the patents in question he did not seize the right to recover from the defendant licensee compensation for their use prior to seizure, the Alien Property Custodian contends that he *did* seize that right but *did not assign* it to the Chemical Foundation, and that, in consequence, the right so lawfully seized and the ownership so lawfully acquired continues in himself.

██ In deciding against the German plaintiffs that on seizure of the patents and royalties the title of the enemy-owners passed out of them, United States v. Chemical Foundation, Inc., supra; Hicks v. Anchor

Packing Co., supra, it follows necessarily that the title went somewhere. That it went to the Alien Property Custodian who captured them on behalf of the United States is the necessary implication, and, as to patents, is the express finding of the Supreme Court when in the Foundation Case it sustained the Custodian's sales of the captured patents. United States v. Chemical Foundation, Inc., 272 U. S. 1, 15, 16, 47 S. Ct. 1, 71 L. Ed. 131. Although the Congress may, when it enacted section 10 (f), have had in mind only the original owners, it is manifest that by the amendments of March 28 and November 4, 1918, authorizing the Custodian to seize and sell enemy owned patents and their incidents, it either recognized or created a new "owner" or class of owners, namely, the Custodian and his vendees, qualified by section 10 (f) to sue licensees for royalties within one year after the end of the war. Therefore we find ourselves in full accord with the contention of the Custodian that his title to the patents and his right to recover royalties were complete and valid by virtue of a lawful seizure. If he had held the patents and retained the right to recover royalties, in other words, if he had remained "owner" of them until now, he would, if he had conformed to other requirements of the Act, have an undoubted right, as against the German plaintiffs and the Chemical Foundation, to recover them. But on April 10, 1919, he sold the patents to the Chemical Foundation and by that act clearly ceased to be "The owner" of the patents within the sense of section 10 (f). The Foundation says that he sold the incidental royalties also. This the Custodian denies. Just here is the turning point in the issue between the Custodian and the Foundation. On this issue we shall do little more than recite the facts.

On April 10, 1919, the Alien Property Custodian, under the authority of executive orders promulgated February 26 and April 5, 1919, by Frank L. Polk, acting for the President (since determined to be valid orders), assigned to the Chemical Foundation "the whole right, title and interest *acquired by* the said Alien Property Custodian as aforesaid, (i. e., by seizure) in and to" the patents here in question, "together with all claims, demands for profits and damages recoverable at law or in equity for the past infringement of said letters patent. * * * "

Doubt having arisen as to the authority of the Custodian to sell and convey to the Foundation "certain of the said choses in action * * * and rights and claims, including *rights to receive moneys by way of*

*royalties* or otherwise, as compensation for the use of patents," the President, by executive order dated February 13, 1920, confirmed the authority of the Custodian in that regard, and further authorized him "to confirm and ratify the said sales by the execution and delivery of a suitable instrument of confirmation."

Thereafter, on March 1, 1921, the Custodian executed a new assignment to the Foundation confirming and ratifying the prior sales of the patents here in question and specifically assigning to it "all choses in action, * * * rights and claims of every character and description growing out of and pertinent to the ownership of said property, *including * * * rights to receive moneys by way of royalties or otherwise as compensation for the use of patents, * * * "* and reciting that the intent and purpose was "to vest in the said Chemical Foundation, Inc. *every* right, title, interest, claim and demand, save such as are specifically excepted in and by the said assignments, *acquired* by the Alien Property Custodian *by virtue of the seizures.*"

■ Both of these conveyances, original and confirmatory, in so far as they related to patents and whatever rights were embodied within their terms, were upheld by the Supreme Court in United States v. Chemical Foundation, Inc., 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131. As it has been decided by several courts and finally by the Supreme Court that the seizure and sale of these patents were lawful, and as we have held in this case, in accord with the Custodian's contention, that the seizure embraced the right to recover royalties on the outstanding license, it follows that when the Custodian by one instrument sold and assigned to the Foundation generally the whole of everything he had acquired through seizure and by the other instrument specifically sold the "rights to receive moneys by way of royalties or otherwise as compensation for the use of patents, * * * acquired by (him) by virtue of the seizures," he sold and divested himself of all he had acquired, which, on his own contention, included the right to recover royalties, and, in consequence, he is no longer "owner" of the patents or of their incidental rights—unless, as he finally maintains, he, or rather his predecessor in office, while having power to sell the patents was without power to sell the right to the royalties on the theory that, in its power to seize and dispose of enemy owned property as it should see fit, United States v. Chemical Foundation, Inc., 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131;

Brown v. United States, 8 Cranch, 110, 3 L. Ed. 504; Miller v. United States, 11 Wall. 268, 20 L. Ed. 135, the Congress has postponed the disposition of royalties arising under war time licenses, including the royalties in suit.

We find no statute whereby the Congress divested, or seemingly intended to divest, a vendee of ownership in property lawfully seized and lawfully conveyed and re-vest it in the Custodian. The Custodian therefore ceased to own the royalties or the right to recover them when he sold and assigned that right to the Chemical Foundation. As the rights of a plaintiff in an action of this kind are defined and limited by the statute, the trial court committed no error when it refused to substitute the Custodian for the German plaintiffs.

And finally, was the Chemical Foundation owner of the royalties, or the right to recover them, at the time of its suit?

It filed its bill within the period prescribed by the statute. The same lawful seizure by a predecessor in title, which divested the original owners of their property, enured to the title of the Foundation. The same valid sale that divested the Custodian of title vested title in the Foundation. It was in consequence "owner" of both patents and right to royalties at the time of its suit, and, as it has not, so far as the record shows, since then relinquished or been lawfully deprived of its ownership and right, it alone is entitled to sue for and recover the royalties in question.

We subscribe to the reasoning of the learned trial judge on the main issues and the related issues of these cases and direct that the decrees be in all respects affirmed.

DAVIS, Circuit Judge, took no part in the consideration and decision of this case.